# PRESLEY *v.* ETOWAH COUNTY COMMISSION ET AL.

No. 90–711.  Argued November 12, 1991—Decided January 27, 1992*

---

*Together with No. 90–712, *Mack et al.* v. *Russell County Commission et al.*, also on appeal from the same court.

492

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, SOUTER, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE and BLACKMUN, JJ., joined, *post*, p. 510.

*Edward Still* argued the cause for appellants in both cases. With him on the briefs were *Pamela Karlan, Lani Guinier, James U. Blacksher,* and *John C. Falkenberry.*

*Robert A. Long, Jr.,* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Deputy Assistant Attorney General Clegg,* and *David K. Flynn.*

*Paul M. Smith* argued the cause for appellees in both cases. With him on the brief for appellee Etowah County Commission were *George Howell (Jack) Floyd* and *Mary Ann Ross Stackhouse. James W. Webb* and *Kendrick E. Webb* filed a brief for appellee Russell County Commission.†

JUSTICE KENNEDY delivered the opinion of the Court.

In various Alabama counties voters elect members of county commissions whose principal function is to supervise

---

†*Julius L. Chambers, Charles Stephen Ralston,* and *Dayna L. Cunningham* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae* urging reversal.

and control the maintenance, repair, and construction of the county roads. See Ala. Code §§ 11–3–1, 11–3–10 (1975). The consolidated appeals now before us concern certain changes in the decisionmaking authority of the elected members on two different county commissions, and the question to be decided is whether these were changes "with respect to voting" within the meaning of § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c. These cases have significance well beyond the two county commissions; for the appellants, and the United States as *amicus curiae*, ask us to adopt a rule embracing the routine actions of state and local governments at all levels. We must interpret the provisions of § 5, which require a jurisdiction covered by the Act to obtain either judicial or administrative preclearance before enforcing any new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." *

---

*As set forth in 42 U. S. C. § 1973c, § 5 provides:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not

## I

To determine whether there have been changes with respect to voting, we must compare the challenged practices with those in existence before they were adopted. Absent relevant intervening changes, the Act requires us to use practices in existence on November 1, 1964, as our standard of comparison.

## A

We consider first the Etowah County Commission. On November 1, 1964, commission members were elected at large under a "residency district" system. The entire electorate of Etowah County voted on candidates for each of the five seats. Four of the seats corresponded to the four

---

have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court."

residency districts of the county. Candidates were required to reside in the appropriate district. The fifth member, the chairman, was not subject to a district residency requirement, though residency in the county itself was a requirement.

Each of the four residency districts functioned as a road district. The commissioner residing in the district exercised control over a road shop, equipment, and road crew for that district. It was the practice of the commission to vote as a collective body on the division of funds among the road districts, but once funds were divided each commissioner exercised individual control over spending priorities within his district. The chairman was responsible for overseeing the solid waste authority, preparing the budget, and managing the courthouse building and grounds.

Under a consent decree issued in 1986, see *Dillard* v. *Crenshaw County*, Civ. Action No. 85–T–1332–N (MD Ala., Nov. 12, 1986), the commission is being restructured, so that after a transition period there will be a six-member commission, with each of the members elected by the voters of a different district. The changes required by the consent decree were precleared by the Attorney General. For present purposes, it suffices to say that when this litigation began the commission consisted of four holdover members who had been on the commission before the entry of the consent decree and two new members elected from new districts. Commissioner Williams, who is white, was elected from new district 6, and Commissioner Presley, who is black, was elected from new district 5. Presley is the principal appellant in the Etowah County case. His complaint relates not to the elections but to actions taken by the four holdover members when he and Williams first took office.

On August 25, 1987, the commission passed the "Road Supervision Resolution." It provided that each holdover commissioner would continue to control the workers and

operations assigned to his respective road shop, which, it must be remembered, accounted for all the road shops the county had. It also gave the four holdovers joint responsibility for overseeing the repair, maintenance, and improvement of all the roads of Etowah County in order to pick up the roads in the districts where the new commissioners resided. The new commissioners, now foreclosed from exercising any authority over roads, were given other functions under the resolution. Presley was to oversee maintenance of the county courthouse and Williams the operation of the engineering department. The Road Supervision Resolution was passed by a 4-to-2 margin, with the two new commissioners dissenting.

The same day the Road Supervision Resolution was passed, the commission passed a second, the so-called "Common Fund Resolution." It provides in part that

> "all monies earmarked and budgeted for repair, maintenance and improvement of the streets, roads and public ways of Etowah County [shall] be placed and maintained in common accounts, [shall] not be allocated, budgeted or designated for use in districts, and [shall] be used county-wide in accordance with need, for the repair, maintenance and improvement of all streets, roads and public ways in Etowah County which are under the jurisdiction of the Etowah County Commission." App. to Juris. Statement in No. 90–711, p. 49a.

This had the effect of altering the prior practice of allowing each commissioner full authority to determine how to spend the funds allocated to his own district. The Etowah County Commission did not seek judicial or administrative preclearance of either the Road Supervision Resolution or the Common Fund Resolution. The District Court held that the Road Supervision Resolution was subject to preclearance but that the Common Fund Resolution was not. No appeal was

taken from the first ruling, so only the Common Fund Resolution is before us in the Etowah County case.

## B

We turn next to the background of the Russell County Commission. On November 1, 1964, it had three commissioners. Like the members of the Etowah County Commission before the consent decree change, Russell County Commissioners were elected at large by the entire electorate, subject to a requirement that a candidate for commissioner reside in the district corresponding to the seat he or she sought. A 1972 federal court order, see *Anthony* v. *Russell County*, No. 961–E (MD Ala., Nov. 21, 1972), required that the commission be expanded to include five members. The two new members were both elected at large from one newly created residency district for Phenix City, the largest city in Russell County. Following the implementation of the court order, each of the three rural commissioners had individual authority over his own road shop, road crew, and equipment. The three rural commissioners also had individual authority for road and bridge repair and construction within their separate residency districts. Although funding for new construction and major repair projects was subject to a vote by the entire commission, individual commissioners could authorize expenditures for routine repair and maintenance work as well as routine purchase orders without seeking approval from the entire commission.

Following the indictment of one commissioner on charges of corruption in Russell County road operations, in May 1979 the commission passed a resolution delegating control over road construction, maintenance, personnel, and inventory to the county engineer, an official appointed by the entire commission and responsible to it. The engineer's previous duties had been limited to engineering and surveying services for the separate road shops and running a small crew devoted to pothole repair. Although the May 1979 resolution

may have sufficed for the necessary delegation of authority to the county engineer, compare Ala. Code § 23–1–80 (1975) with Ala. Code § 11–6–3 (1975), the commission also requested the state legislature to pass implementing legislation. The Alabama Legislature did so on July 30, 1979, when it enacted Act No. 79–652, 1979 Ala. Acts 1132. It provides in pertinent part:

> "Section 1. All functions, duties and responsibilities for the construction, maintenance and repair of public roads, highways, bridges and ferries in Russell County are hereby vested in the county engineer, who shall, insofar as possible, construct and maintain such roads, highways, bridges and ferries on the basis of the county as a whole or as a unit, without regard to district or beat lines."

The parties refer to abolition of the individual road districts and transfer of responsibility for all road operations to the county engineer as the adoption of a "Unit System." Neither the resolution nor the statute which authorized the Unit System was submitted for preclearance under § 5.

Litigation involving the Russell County Commission led to a 1985 consent decree, see *Sumbry* v. *Russell County*, No. 84–T–1386–E (MD Ala., Mar. 17, 1985), that enlarged the commission to seven members and replaced the at-large election system with elections on a district-by-district basis. Without any mention of the Unit System changes, the consent decree was precleared by the Department of Justice under § 5. Following its implementation, appellants Mack and Gosha were elected in 1986. They are Russell County's first black county commissioners in modern times.

### C

In May 1989, appellants in both cases now before us filed a single complaint in the District Court for the Middle District of Alabama, alleging racial discrimination in the

operation of the Etowah and Russell County Commissions in violation of prior court orders, the Constitution, Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d, and § 2 of the Voting Rights Act, 42 U. S. C. § 1973. In a series of amended complaints, appellants added claims under § 5. The § 5 claims alleged that Etowah County had violated the Act by failing to obtain preclearance of the 1987 Road Supervision and Common Fund Resolutions, and that Russell County had failed to preclear the 1979 change to the Unit System. Pursuant to 28 U. S. C. § 2284, a three-judge District Court was convened to hear appellants' § 5 claims. The other claims still pend in the District Court.

With respect to the issues now before us, a majority of the District Court held that neither the Common Fund Resolution of the Etowah County Commission nor the adoption of the Unit System in Russell County was subject to § 5 preclearance. The court held that changes in the responsibilities of elected officials are subject to preclearance when they "effect a significant relative change in the powers exercised by governmental officials elected by, or responsible to, substantially different constituencies of voters." App. to Juris. Statement in No. 90–711, pp. 13a–14a. Applying its test, the court found that the Common Fund Resolution in Etowah County did not effect a significant change and adoption of the Unit System in Russell County did not transfer authority among officials responsible to different constituencies. We noted probable jurisdiction. 500 U. S. 914 (1991). We affirm the District Court but adopt a different interpretation of § 5 as the rationale for our decision.

## II

We first considered the Voting Rights Act in *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966). Although we acknowledged that suspension of new voting regulations pending preclearance was an extraordinary departure from the traditional course of relations between the States and the

Federal Government, *id.*, at 334, we held it constitutional as a permitted congressional response to the unremitting attempts by some state and local officials to frustrate their citizens' equal enjoyment of the right to vote. See *id.*, at 308–315.

After *South Carolina* v. *Katzenbach* upheld the Voting Rights Act against a constitutional challenge, it was not until we heard *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969), that we were called upon to decide whether particular changes were covered by § 5. There we rejected a narrow construction, one which would have limited § 5 to state rules prescribing who may register to vote. We held that the section applies also to state rules relating to the qualifications of candidates and to state decisions as to which offices shall be elective. *Id.*, at 564–565. We observed that "[t]he Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Id.*, at 565. Our decision, and its rationale, have proved sound, and we adhere to both.

In giving a broad construction to § 5 in *Allen*, we noted that "Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way." *Id.*, at 566. Relying on this language and its application in later cases, appellants and the United States now argue that because there is no *de minimis* exception to § 5, the changes at issue here must be subject to preclearance. *E. g.*, Brief for United States as *Amicus Curiae* 21–22. This argument, however, assumes the answer to the principal question in the case: whether the changes at issue are changes in voting, or as we phrased it in *Allen*, "election law."

We agree that all changes in voting must be precleared and with *Allen*'s holding that the scope of § 5 is expansive within its sphere of operation. That sphere comprehends all changes to rules governing voting, changes effected

through any of the mechanisms described in the statute. Those mechanisms are any "qualification or prerequisite" or any "standard, practice, or procedure with respect to voting."

The principle that § 5 covers voting changes over a wide range is well illustrated by the separate cases we considered in the single opinion for the Court in *Allen*. *Allen* involved four cases. The eponymous *Allen* v. *State Bd. of Elections* concerned a change in the procedures for the casting of write-in ballots. 393 U. S., at 570–571. In *Whitley* v. *Williams*, there were changes in the requirements for independent candidates running in general elections. *Id.*, at 551. The challenged procedure in *Fairley* v. *Patterson* resulted in a change from single-district voting to at-large voting. *Id.*, at 550. The remaining case, *Bunton* v. *Patterson*, involved a statute which provided that officials who in previous years had been elected would be appointed. *Id.*, at 550–551. We held that the changes in each of the four cases were covered by § 5.

Our cases since *Allen* reveal a consistent requirement that changes subject to § 5 pertain only to voting. Without implying that the four typologies exhaust the statute's coverage, we can say these later cases fall within one of the four factual contexts presented in the *Allen* cases. First, we have held that § 5 applies to cases like *Allen* v. *State Bd. of Elections* itself, in which the changes involved the manner of voting. See *Perkins* v. *Matthews*, 400 U. S. 379, 387 (1971) (location of polling places). Second, we have held that § 5 applies to cases like *Whitley* v. *Williams*, which involve candidacy requirements and qualifications. See *NAACP* v. *Hampton County Election Comm'n*, 470 U. S. 166 (1985) (change in filing deadline); *Hadnott* v. *Amos*, 394 U. S. 358 (1969) (same); *Dougherty County Bd. of Ed.* v. *White*, 439 U. S. 32 (1978) (rule requiring board of education members to take unpaid leave of absence while campaigning for office). Third, we have applied § 5 to cases like *Fairley* v. *Patterson*,

which concerned changes in the composition of the electorate that may vote for candidates for a given office. See *Perkins* v. *Matthews*, 400 U. S., at 394 (change from ward to at-large elections); *id.*, at 388 (boundary lines of voting districts); *City of Richmond* v. *United States*, 422 U. S. 358 (1975) (same). Fourth, we have made clear that §5 applies to changes, like the one in *Bunton* v. *Patterson*, affecting the creation or abolition of an elective office. See *McCain* v. *Lybrand*, 465 U. S. 236 (1984) (appointed officials replaced by elected officials); *Lockhart* v. *United States*, 460 U. S. 125 (1983) (increase in number of city councilors).

The first three categories involve changes in election procedures, while all the examples within the fourth category might be termed substantive changes as to which offices are elective. But whether the changes are of procedure or substance, each has a direct relation to voting and the election process.

### III

A comparison of the changes at issue here with those in our prior decisions demonstrates that the present cases do not involve changes covered by the Act.

### A

The Etowah County Commission's Common Fund Resolution is not a change within any of the categories recognized in *Allen* or our later cases. It has no connection to voting procedures: It does not affect the manner of holding elections, it alters or imposes no candidacy qualifications or requirements, and it leaves undisturbed the composition of the electorate. It also has no bearing on the substance of voting power, for it does not increase or diminish the number of officials for whom the electorate may vote. Rather, the Common Fund Resolution concerns the internal operations of an elected body.

Appellants argue that the Common Fund Resolution is a covered change because after its enactment each commis-

sioner has less individual power than before the resolution. A citizen casting a ballot for a commissioner today votes for an individual with less authority than before the resolution, and so, it is said, the value of the vote has been diminished.

Were we to accept appellants' proffered reading of § 5, we would work an unconstrained expansion of its coverage. Innumerable state and local enactments having nothing to do with voting affect the power of elected officials. When a state or local body adopts a new governmental program or modifies an existing one it will often be the case that it changes the powers of elected officials. So too, when a state or local body alters its internal operating procedures, for example, by modifying its subcommittee assignment system, it "implicate[s] an elected official's *decisionmaking authority.*" Brief for United States as *Amicus Curiae* 17–18 (emphasis in original).

Appellants and the United States fail to provide a workable standard for distinguishing between changes in rules governing voting and changes in the routine organization and functioning of government. Some standard is necessary, for in a real sense every decision taken by government implicates voting. This is but the felicitous consequence of democracy, in which power derives from the people. Yet no one would contend that when Congress enacted the Voting Rights Act it meant to subject all or even most decisions of government in covered jurisdictions to federal supervision. Rather, the Act by its terms covers any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U. S. C. § 1973c. A faithful effort to implement the design of the statute must begin by drawing lines between those governmental decisions that involve voting and those that do not.

A simple example shows the inadequacy of the line proffered by appellants and the United States. Under appellants' view, every time a covered jurisdiction passed a budget that differed from the previous year's budget it would be

required to obtain preclearance. The amount of funds available to an elected official has a profound effect on the power exercised. A vote for an ill-funded official is less valuable than a vote for a well-funded one.

No doubt in recognition of the unacceptable consequences of their views, appellants take the position that while "some budget changes may affect the right to vote and, under particular circumstances, would be subject to preclearance," most budget changes would not. Postargument Letter from Counsel for Appellants, Nov. 13, 1991 (available in Clerk of Court's case file). Under their interpretation of § 5, however, appellants fail to give any workable standard to determine when preclearance is required. And were we to acknowledge that a budget adjustment is a voting change in even some instances, the likely consequence is that every budget change would be covered, for it is well settled that every voting change with a "potential for discrimination" must be precleared. *Dougherty County Bd. of Ed.* v. *White*, 439 U. S., at 42.

Confronting this difficulty, at oral argument the United States suggested that we draw an arbitrary line distinguishing between budget changes and other changes, Tr. of Oral Arg. 21–23. There is no principled basis for the distinction, and it would be a marked departure from the statutory category of voting. If a diminution or increase in an elected official's powers is a change with respect to voting, then whether it is accomplished through an enactment or a budget shift should not matter. Even if we were willing to draw an unprincipled line excluding budgetary changes but not other changes in an elected official's decisionmaking authority, the result would expand the coverage of § 5 well beyond the statutory language and the intention of Congress.

Under the view advanced by appellants and the United States, every time a state legislature acts to diminish or increase the power of local officials, preclearance would be required. Governmental action decreasing the power of local

officials could carry with it a potential for discrimination against those who represent racial minorities at the local level. At the same time, increasing the power of local officials will entail a relative decrease in the power of state officials, and that too could carry with it a potential for discrimination against state officials who represent racial minorities at the state level. The all but limitless minor changes in the allocation of power among officials and the constant adjustments required for the efficient governance of every covered State illustrate the necessity for us to formulate workable rules to confine the coverage of § 5 to its legitimate sphere: voting.

Changes which affect only the distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting. The Etowah County Commission's Common Fund Resolution was not subject to the preclearance requirement.

## B

We next consider Russell County's adoption of the Unit System and its concomitant transfer of operations to the county engineer. Of the four categories of changes in rules governing voting we have recognized to date, there is not even an arguable basis for saying that adoption of the Unit System fits within any of the first three. As to the fourth category, it might be argued that the delegation of authority to an appointed official is similar to the replacement of an elected official with an appointed one, the change we held subject to § 5 in *Bunton* v. *Patterson.* This approach, however, would ignore the rationale for our holding: "[A]fter the change, [the citizen] is prohibited from electing an officer formerly subject to the approval of the voters." *Allen,* 393 U. S., at 569–570. In short, the change in *Bunton* v. *Patterson* involved a rule governing voting not because it effected a change in the relative authority of various governmental

officials, but because it changed an elective office to an appointive one.

The change in Russell County does not prohibit voters "from electing an officer formerly subject to the[ir] approval." *Allen, supra,* at 570. Both before and after the change the citizens of Russell County were able to vote for the members of the Russell County Commission. To be sure, after the 1979 resolution each commissioner exercised less direct authority over road operations, that authority having been delegated to an official answerable to the commission. But as we concluded with respect to Etowah County, the fact that an enactment alters an elected official's powers does not in itself render the enactment a rule governing voting.

It is a routine part of governmental administration for appointive positions to be created or eliminated and for their powers to be altered. Each time this occurs the relative balance of authority is altered in some way. The making or unmaking of an appointive post often will result in the erosion or accretion of the powers of some official responsible to the electorate, but it does not follow that those changes are covered by § 5. By requiring preclearance of changes with respect to voting, Congress did not mean to subject such routine matters of governance to federal supervision. Were the rule otherwise, neither state nor local governments could exercise power in a responsible manner within a federal system.

The District Court, wrestling with the problem we now face and recognizing the need to draw principled lines, held that Russell County's adoption of the Unit System is not a covered change because it did not transfer power among officials answerable to different constituencies. Even upon the assumption (the assumption we reject in this case) that some transfers of power among government officials could be changes with respect to voting as that term is used in the Act, we disagree with the District Court's test. The ques-

tion whether power is shifted among officials answerable to the same or different constituencies is quite distinct from the question whether the power voters exercise over elected officials is affected. Intraconstituency changes may have a large indirect effect on the voters while interconstituency changes may have a small indirect effect, but in neither case is the effect a change in voting for purposes of the Act. The test adopted by the District Court does not provide the workable rule we seek. In any event, because it proceeds from the faulty premise that reallocations of authority within government can constitute voting changes, we cannot accept its approach.

We need not consider here whether an otherwise un-covered enactment of a jurisdiction subject to the Voting Rights Act might under some circumstances rise to the level of a *de facto* replacement of an elective office with an ap-pointive one, within the rule of *Bunton* v. *Patterson.* For present purposes it suffices to note that the Russell County Commission retains substantial authority, including the power to appoint the county engineer and to set his or her budget. The change at issue in Russell County is not a cov-ered change.

## IV

The United States urges that despite our understanding of the language of §5, we should defer to its administrative construction of the provision. We have recognized that "the construction placed upon the [Voting Rights] Act by the Attorney General . . . is entitled to considerable deference." *NAACP* v. *Hampton County Election Comm'n,* 470 U. S., at 178–179. See also *United States* v. *Sheffield Bd. of Comm'rs,* 435 U. S. 110, 131 (1978). But the principle has its limits. Deference does not mean acquiescence. As in other contexts in which we defer to an administrative interpreta-tion of a statute, we do so only if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable. See, *e. g., Chev-*

*ron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–844 (1984). Because the first of these conditions is not satisfied in the cases before us we do not defer to the Attorney General's interpretation of the Act.

We do not believe that in its use of the phrase "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," 42 U. S. C. § 1973c, the statute is ambiguous as to the question whether § 5 extends beyond changes in rules governing voting. To be sure, reasonable minds may differ as to whether some particular changes in the law of a covered jurisdiction should be classified as changes in rules governing voting. In that sense § 5 leaves a gap for interpretation to fill. See *Chevron, supra,* at 843. When the Attorney General makes a reasonable argument that a contested change should be classified as a change in a rule governing voting, we can defer to that judgment. But § 5 is unambiguous with respect to the question whether it covers changes other than changes in rules governing voting: It does not. The administrative position in the present cases is not entitled to deference, for it suggests the contrary. The United States argues that the changes are covered by § 5 because they implicate the decisionmaking authority of elected officials, even though they are not changes in rules governing voting. This argument does not meet the express requirement of the statute.

V

Nothing we say implies that the conduct at issue in these cases is not actionable under a different remedial scheme. The Voting Rights Act is not an all-purpose antidiscrimination statute. The fact that the intrusive mechanisms of the Act do not apply to other forms of pernicious discrimination does not undermine its utility in combating the specific evils it was designed to address.

Our prior cases hold, and we reaffirm today, that every change in rules governing voting must be precleared. The

legislative history we rehearsed in *South Carolina* v. *Katzenbach* was cited to demonstrate Congress' concern for the protection of voting rights. Neither the appellants nor the United States has pointed to anything we said there or in the statutes reenacting the Voting Rights Act to suggest that Congress meant other than what it said when it made § 5 applicable to changes "with respect to voting" rather than, say, changes "with respect to governance."

If federalism is to operate as a practical system of governance and not a mere poetic ideal, the States must be allowed both predictability and efficiency in structuring their governments. Constant minor adjustments in the allocation of power among state and local officials serve this elemental purpose.

Covered changes must bear a direct relation to voting itself. That direct relation is absent in both cases now before us. The changes in Etowah and Russell Counties affected only the allocation of power among governmental officials. They had no impact on the substantive question whether a particular office would be elective or the procedural question how an election would be conducted. Neither change involves a new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U. S. C. § 1973c.

The judgment of the District Court is affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE WHITE and JUSTICE BLACKMUN join, dissenting.

In 1986, an important event occurred in each of two Alabama counties with long histories of white-dominated political processes. In Etowah County, a black commissioner was elected to the county commission for the first time in recent history, and in Russell County, two black commissioners were elected to the county commission for the first time in

"modern times." App. to Juris. Statement of Appellant Presley 4a. Because of the three resolutions at issue in these cases—two adopted in Etowah County after Commissioner Presley's election and one adopted in Russell County before the election of Commissioners Mack and Gosha—none of the three newly elected black commissioners was able to exercise the decisionmaking authority that had been traditionally associated with his office.

As I shall explain, this is a case in which a few pages of history are far more illuminating than volumes of logic and hours of speculation about hypothetical line-drawing problems. Initially, however, it is important to note that a different decision in these cases would not impose any novel or significant burden on those jurisdictions that remain covered under §5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c.[1]

Prior to these cases, federal courts had uniformly agreed with the Attorney General's interpretation that §5 covered transfers of decisionmaking power that had a potential for discrimination against minority voters.[2] On at least eight

---

[1] Alabama, like the other States that are covered under §5, was placed in that category because of its history of "substantial voting discrimination." *South Carolina* v. *Katzenbach,* 383 U. S. 301, 329 (1966).

[2] See *Horry County* v. *United States,* 449 F. Supp. 990 (D. C. 1978) (statute providing for election of public officials who were formerly appointed by Governor required preclearance under §5); *Hardy* v. *Wallace,* 603 F. Supp. 174 (ND Ala. 1985) (statute changing appointive power over local racing commission from local legislative delegation to Governor required preclearance under §5); *County Council of Sumter County* v. *United States,* 555 F. Supp. 694 (D. C. 1983) (law that eliminated legal power of Governor and General Assembly over local affairs and vested it in county council elected at large by county voters required preclearance under §5); *Robinson* v. *Alabama State Dept. of Ed.,* 652 F. Supp. 484 (MD Ala. 1987) (transfer of authority from Board of Education whose members were elected countywide to one whose members were appointed by the city council required §5 preclearance).

occasions since 1975,[3] the Department of Justice has refused to preclear changes in the power of elected officials that had a potentially discriminatory[4] impact on black voters. The Department has routinely precleared numerous other transfers of authority after determining that they had no discriminatory purpose or effect.[5] There is no evidence that the pre-

---

[3] The Solicitor General has advised us that the Department has objected to the following transfers of authority: .

"(1) Mobile, Alabama, March 2, 1976, involving a transfer of administrative duties from the entire commission to individual commissioners; (2) Charleston, South Carolina, June 14, 1977, involving a transfer of taxing authority from the legislative delegation to the county council; (3) Edgefield County, South Carolina, February 8, 1979, involving a transfer of increased taxing power to the county council; (4) Colleton County, South Carolina, September 4, 1979, involving a transfer of authority to tax for school purposes from the legislative delegation to the county council; (5) Brunswick and Blynn County, Georgia, August 16, 1982, involving the abolition of separate city and county commissions and the transfer of their powers to a consolidated commission; (6) Hillsborough County, Florida, August 29, 1984, involving a transfer of power over municipalities from the legislative delegation to the county commission (objection was withdrawn because the county made clear that it did not intend to effect such a transfer); (7) Waycross, Georgia, February 16, 1988, involving a change in the duties of the mayor; and (8) San Patricio, Texas, May 7, 1990, involving a transfer of voter registration duties from the county clerk to the county tax assessor." Brief for United States as *Amicus Curiae* 16, n. 6.

[4] Whether a change in "any . . . standard, practice, or procedure with respect to voting," 42 U. S. C. § 1973c, must be precleared under § 5 depends, not on whether the change "resulted in impairment of the right to vote, or whether [it was] intended to have that effect," but rather, on "whether the challenged alteration has the *potential* for discrimination." *NAACP* v. *Hampton County Election Comm'n*, 470 U. S. 166, 181 (1985); see *McCain* v. *Lybrand*, 465 U. S. 236, 250, n. 17 (1984); *Dougherty County Bd. of Ed.* v. *White*, 439 U. S. 32, 42 (1978) (issue "is not whether the provision is in fact innocuous and likely to be approved, but whether it has a *potential* for discrimination"); *Georgia* v. *United States*, 411 U. S. 526, 534 (1973); *Perkins* v. *Matthews*, 400 U. S. 379, 383–385 (1971); *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 555, n. 19, 558–559 (1969).

[5] Brief for United States as *Amicus Curiae* 16–17.

vailing practice imposed any special burden on covered jurisdictions. For example, in this fiscal year the Attorney General has processed over 17,000 preclearance requests, and has approved over 99 percent of them without any undue delay.[6] It is, therefore, simply hyperbole for the Court to suggest that if we adopted the Attorney General's position in this case "neither state nor local governments could exercise power in a responsible manner within a federal system." *Ante*, at 507.[7]

---

[6] Tr. of Oral Arg. 27. The Attorney General's percentage has undergone little change even though the number of submissions has increased over time. For example, when *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969), was decided, the Department of Justice had received 251 submissions from States covered under § 5 and had approved over 99 percent of the submissions. *Id.*, at 549, n. 5. Figures available in 1978 indicated that the Department processed 1,800 submissions annually, and had approved over 98 percent of those submissions. *Dougherty County Bd. of Ed.* v. *White*, 439 U. S., at 41.

[7] In the past, various Members of the Court have objected to the types of changes that require preclearance under § 5 in covered States, and have predicted that the Court's construction of the statute would leave it without boundaries. In *Perkins* v. *Matthews*, for example, Justice Harlan expressed the view that the Court was mistaken in holding that annexations are within the scope of § 5 and that the Court had gone too far in its interpretation of "with respect to voting": "Given a change with an effect on voting, a set of circumstances may be conceived with respect to almost any situation in which the change will bear more heavily on one race than on another. In effect, therefore, the Court requires submission of any change which has an effect on voting." 400 U. S., at 398 (opinion concurring in part and dissenting in part). Similarly, Justice Powell, taking the view in *Dougherty* that a "personnel rule" should not fall within the scope of § 5 as the Court had held, was concerned that "if the Court truly means that any incidental impact on elections is sufficient to trigger the preclearance requirement of § 5, then it is difficult to imagine what sorts of state or local enactments would *not* fall within the scope of that section." 439 U. S., at 54 (dissenting opinion) (footnote omitted). The fears the Court expresses today, see *ante*, at 507, are no more likely to be realized than those expressed by Justice Harlan and Justice Powell years ago.

In all of our prior cases interpreting § 5 of the Voting Rights Act, the Court has agreed with the Attorney General's construction of this important statute.[8]  I share the Court's view that the "considerable deference" to which the Attorney General's construction is entitled[9] does not mean automatic "acquiescence," *ante,* at 508; however, I strongly disagree with the Court that our task in these cases is "to formulate workable rules to confine the coverage of § 5 to its legitimate sphere: voting." *Ante,* at 506.  For reasons that I shall explain, even if the Attorney General, participating in these cases as *amicus curiae,* has asked the Court to adopt a broader rationale than is necessary or appropriate, a narrower basis for a decision is obviously available in the Etowah County case and, in my judgment, in the Russell County case as well.

I

The original enactment of § 5, the interpretations of the Act by this Court and by the Attorney General, and the reenactment of the statute by Congress in light of those interpretations reveal a continuous process of development in response to changing conditions in the covered jurisdictions.

The central purpose of the original Act was to eliminate the various devices, such as literacy tests, requirements of "good moral character," vouchers, and poll taxes, that had excluded black voters from the registration and voting process in the southern States for decades.[10]  As we explained in *McCain* v. *Lybrand,* 465 U. S. 236 (1984):

---

[8] See, *e. g., Perkins* v. *Matthews,* 400 U. S., at 390–391 ("Our conclusion that both the location of the polling places and municipal boundary changes come within § 5 draws further support from the interpretation followed by the Attorney General in his administration of the statute"); *United States* v. *Sheffield Bd. of Comm'rs,* 435 U. S. 110, 131 (1978); *Dougherty County Bd. of Ed.* v. *White,* 439 U. S., at 39.

[9] *NAACP* v. *Hampton County Election Comm'n,* 470 U. S., at 178–179.

[10] "'Tests or devices'" include

"any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or inter-

"The Voting Rights Act of 1965, as amended, 42 U. S. C. § 1973 *et seq.* (1976 ed. and Supp. V), was enacted by Congress as a response to the 'unremitting and ingenious defiance' of the command of the Fifteenth Amendment for nearly a century by state officials in certain parts of the Nation. *South Carolina* v. *Katzenbach,* 383 U. S. 301, 309 (1966). Congress concluded that case-by-case litigation under previous legislation was an unsatisfactory method to uncover and remedy the systematic discriminatory election practices in certain areas: such lawsuits were too onerous and time-consuming to prepare, obstructionist tactics by those determined to perpetuate discrimination yielded unacceptable delay, and even successful lawsuits too often merely resulted in a change in methods of discrimination. *E. g.,* H. R. Rep. No. 439, 89th Cong., 1st Sess., 9–11 (1965). Congress decided 'to shift the advantage of time and inertia from the perpetrators of the evil to its victims,' 383 U. S., at 328, and enacted 'stringent new remedies' designed to 'banish the blight of racial discrimination in voting' once and for all, *id.,* at 308." *Id.,* at 243–244 (footnote omitted).

During the first few years after the enactment of § 5, the federal courts gave its text a narrow literal construction that confined its coverage to the political subdivisions that registered voters and to the practices that directly concerned the registration and voting process. Prior to the Court's decision in *Allen* v. *State Bd. of Elections,* 393 U. S. 544 (1969), only three States submitted any changes to the Attorney General for preclearance and a total of only 323 changes were

---

pret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." 42 U. S. C. § 1973b(c).

As this Court recognized in *South Carolina* v. *Katzenbach,* 383 U. S., at 330, "[t]ests and devices are relevant to voting discrimination because of their long history as a tool for perpetrating the evil."

submitted during the first five years of administration.[11] At
that time, the covered jurisdictions were able to respond to
the increase in the number of black registered voters by
means that prevented the newly registered minority voters
from having a proportionate impact on the political process.

In *Allen* and its companion cases,[12] however, the Court
held that some of these responses, even if not described in
the literal text of the Act, were nevertheless included within
the scope of § 5. Relying heavily on the statutory definition
of voting as encompassing " 'all action necessary to make a
vote effective,' " 393 U. S., at 565–566, and the broad reme-
dial purposes of the Act, the Court held that a change from
district to at-large voting for county supervisors, a change
that made an important county office appointive rather than
elective, and a change that altered the requirements for inde-
pendent candidates, were all covered voting practices. *Id.*,
at 569–571. Thus, § 5 was not limited to changes directly
affecting the casting of a ballot. *Id.*, at 569 ("The right to
vote can be affected by a dilution of voting power as well as
by an absolute prohibition on casting a ballot. See *Reyn-
olds* v. *Sims*, 377 U. S. 533, 555 (1964)"). Nothing in *Allen*
implied that the Court had defined an exhaustive category
of changes covered by the Act.[13] On the contrary, the Court

[11] See *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S., at 148, n. 10
(STEVENS, J., dissenting); see also U. S. Commission on Civil Rights, The
Voting Rights Act: Ten Years After, p. 25, n. 53 (1975) ("In the first 6
years of the act, section 5 was hardly used at all").

[12] *Allen* was argued along with *Fairley* v. *Patterson*, 393 U. S. 544 (1969)
(§ 5 applied to a change from district to at-large election of county supervi-
sors), *Bunton* v. *Patterson*, 393 U. S. 544 (1969) (§ 5 applied to change in
which the position of county officer became appointive instead of elective),
and *Whitley* v. *Williams*, 393 U. S. 544 (1969) (changes aimed at increasing
the difficulty for an independent candidate to gain a position on a general
election ballot were subject to § 5), on appeal from the United States Dis-
trict Court for the Southern District of Mississippi.

[13] Although the majority today agrees that § 5 is not limited to only the
changes covered in our earlier opinions, see *ante*, at 502, it nevertheless
attempts to fit today's changes into one of the earlier models, see *ante*, at

described § 5 as "aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race," *id.*, at 565, and expressed, in no uncertain terms, that § 5 should be given "the broadest possible scope," *id.*, at 567. Aware of the consequences of its decision, the Court gave its broad reading of the Act "only prospective effect." *Id.*, at 572.

The Court's construction of the Act in *Allen*, as requiring preclearance of changes in covered jurisdictions that were responsive to the increase in the number of black registered voters,[14] was consistent with the concern that justified the extraordinary remedy set forth in § 5 itself, particularly the concern that recalcitrant white majorities could be expected to devise new stratagems to maintain their political power if not closely scrutinized.

> "The rationale of this 'uncommon exercise' of congressional power which sustained its constitutional validity was a presumption that jurisdictions which had 'resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees' would be likely to engage in 'similar maneuvers in the future in order to evade the remedies

---

503, 506–507. The Court's approach today marks a departure from the approach we have taken in the past. For example, in *NAACP* v. *Hampton County Election Comm'n*, even though the Court recognized that it had "never addressed itself to alterations in voting procedures that exactly parallel those at issue in this case," 470 U. S., at 176, it nevertheless concluded that § 5 was broad enough to encompass a change in election date, *id.*, at 182–183.

[14] U. S. Commission on Civil Rights, The Voting Rights Act: Ten Years After, at 69 ("The end of formal barriers brought about by the Voting Rights Act resulted in an immediate increase in minority registration"); H. R. Rep. No. 94–196, p. 6 (1975) ("Prior to 1965, the black registration rate in the State of Alabama lagged behind that of whites in that state by 49.9 percentage points. In 1972, that disparity had decreased to 23.6 percentage points").

for voting discrimination contained in the Act itself.' *South Carolina* v. *Katzenbach, supra,* at 334, 335 (footnote omitted). This provision must, of course, be interpreted in light of its prophylactic purpose and the historical experience which it reflects. See, *e. g., McDaniel* v. *Sanchez,* 452 U. S. 130, 151 (1981)." *McCain* v. *Lybrand,* 465 U. S., at 245–246.

Thus, § 5 was understood to be "a 'vital element' of the Act," and was designed to be flexible enough to ensure that " 'new subterfuges will be promptly discovered and enjoined.' " *Id.,* at 248 (citation omitted).[15] Section 5, as construed by the Court, was not limited to a "simple inventory of voting procedures," but rather, was understood to address "the reality of changed practices as they affect Negro voters." *Georgia* v. *United States,* 411 U. S. 526, 531 (1973).

In subsequent cases, this Court has reaffirmed the broad scope of § 5 coverage, as first articulated by the Court in *Allen.*[16] The Court has interpreted § 5 expansively and has said in the context of candidate qualification that a statute requiring independent candidates to declare their intention to seek office two months earlier than under the previous procedures created a barrier to candidacy and required § 5 preclearance, *Hadnott* v. *Amos,* 394 U. S. 358 (1969), and in other contexts, that preclearance is required when there is a change in polling places, *Perkins* v. *Matthews,* 400 U. S. 379 (1971), an alteration in municipal boundaries, *City of Rich-*

---

[15] "[I]n modern-day voting rights cases such as this one, . . . racial discrimination will more than likely not show itself in the blatant forms of the past but instead will be subtle and sophisticated . . . ." App. to Juris. Statement of Appellant Presley 37a (Thompson, J., concurring in part and dissenting in part).

[16] See *Dougherty County Bd. of Ed.* v. *White,* 439 U. S., at 38 ("In subsequent cases interpreting § 5, we have consistently adhered to the principles of broad construction set forth in *Allen*"); *NAACP* v. *Hampton County Election Comm'n,* 470 U. S., at 176 ("Our precedents recognize that to effectuate the congressional purpose, § 5 is to be given broad scope").

*mond* v. *United States,* 422 U. S. 358 (1975), reapportionment and redistricting plans, *Georgia* v. *United States,* 411 U. S., at 532–533, and the introduction of numbered posts and staggered terms, *Lockhart* v. *United States,* 460 U. S. 125, 131, 132, 134–135 (1983).

The reenactment of § 5 in 1970, Pub. L. 91–285, 84 Stat. 314,[17] in 1975, Pub. L. 94–73, 89 Stat. 400,[18] and in 1982, Pub. L. 97–205, 96 Stat. 131,[19] reflected congressional approval of *Allen's* broad interpretation of the Act. Indeed, congressional comments quoted in our opinion in *Perkins* v. *Matthews, supra,* expressly endorsed an interpretation of § 5 that takes into account white resistance to progress in black registration.

> "One Congressman who had supported the 1965 Act observed, 'When I voted for the Voting Rights Act of 1965, I hoped that 5 years would be ample time. But resistance to progress has been more subtle and more effective than I thought possible. A whole arsenal of racist weapons has been perfected. Boundary lines have been gerrymandered, elections have been switched to an at-large basis, counties have been consolidated,

[17] "After extensive deliberations in 1970 on bills to extend the Voting Rights Act, during which the *Allen* case was repeatedly discussed, the Act was extended for five years, without any substantive modification of § 5." *Georgia* v. *United States,* 411 U. S., at 533 (footnote omitted); see *Dougherty County Bd. of Ed.* v. *White,* 439 U. S., at 38–39.

[18] "Again in 1975, both the House and Senate Judiciary Committees, in recommending extension of the Act, noted with approval the 'broad interpretations to the scope of Section 5' in *Allen* and *Perkins* v. *Matthews.*" *Dougherty,* 439 U. S., at 39.

[19] "[T]he legislative history of the most recent extension of the Voting Rights Act in 1982 reveals that the congressional commitment to its continued enforcement is firm. The Senate Committee found 'virtual unanimity among those who [had] studied the record,' S. Rep. No. 97–417, p. 9 (1982), that § 5 should be extended. And, as it had in previous extensions of the Act, Congress specifically endorsed a broad construction of the provision." *NAACP* v. *Hampton County Election Comm'n,* 470 U. S., at 176 (footnote omitted).

elective offices have been abolished where blacks had a chance of winning, the appointment process has been substituted for the elective process, election officials have withheld the necessary information for voting or running for office, and both physical and economic intimidation have been employed.

" 'Section 5 was intended to prevent the use of most of these devices.' " 400 U. S., at 389, n. 8.[20]

Since the decision in *Allen*, the debate on reenactment of §5 in 1970, and the issuance of regulations by the Department of Justice,[21] it has been recognized that the replacement of an elective office that might be won by a black candidate with an appointive office is one of the methods of maintaining a white majority's political power that §5 was designed to forestall. As a practical matter, such a change has the same effect as a change that makes an elected official a mere figurehead by transferring his decisionmaking authority to an

---

[20] Congress recognized that "since the adoption of the Voting Rights Act, covered jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices that dilute minority voting strength," S. Rep. No. 97–417, p. 10 (1982), and that §5 was intended to be responsive to this shift:

"Following the dramatic rise in registration, a broad array of dilution schemes were employed to cancel the impact of the new black vote. Elective posts were made appointive; election boundaries were gerrymandered; majority runoffs were instituted to prevent victories under a prior plurality system; at-large elections were substituted for election by single-member districts, or combined with other sophisticated rules to prevent an effective minority vote. The ingenuity of such schemes seems endless. Their common purpose and effect has been to offset the gains made at the ballot box under the Act.

"Congress anticipated this response. The preclearance provisions of Section 5 were designed to halt such efforts." *Id.*, at 6.

[21] On September 10, 1971, the Department of Justice first adopted regulations implementing §5's preclearance provisions. S. Rep. No. 94–295, p. 16 (1975); see 36 Fed. Reg. 18186 (Sept. 10, 1971); 28 CFR pt. 51 (1972); see also *Georgia* v. *United States*, 411 U. S., at 536–541 (approving regulations).

appointed official, or to a group of elected officials controlled by the majority. Although this type of response to burgeoning black registration may not have been prevalent during the early history of the Act, it has been an active concern of the Attorney General since 1976. See n. 3, *supra*. In my judgment, such a change in the reallocation of decision-making authority in an elective office, at least in its most blatant form, is indistinguishable from, and just as unacceptable as, gerrymandering boundary lines or switching elections from a district to an at-large basis.

## II

The two resolutions adopted by the Etowah County Commission on August 25, 1987, less than nine months after the county's first black commissioner took office, were an obvious response to the redistricting of the county that produced a majority black district from which a black commissioner was elected. In my view, it was wrong for the District Court to divorce the two parts of this consolidated response and to analyze the two resolutions separately.[22] The characteriza-

---

[22] The District Court was also wrong to exempt the Common Fund Resolution from § 5 preclearance on the ground that "the common fund resolution was, in practical terms, insignificant in comparison to the entire Commission's authority . . . ." App. to Juris. Statement of Appellant Presley 19a. This is clearly the wrong test in light of our earlier cases, in which we have said that even "minor" changes affecting elections and voting must be precleared. *Allen* v. *State Bd. of Elections,* 393 U. S., at 566, 568 ("It is significant that Congress chose not to include even . . . minor exceptions in § 5, thus indicating an intention that all changes, no matter how small, be subjected to § 5 scrutiny"); see also *Perkins* v. *Matthews,* 400 U. S., at 387. For example, the Court has said that § 5 preclearance applies to the transfer of a polling place, *id.,* at 388, and the extension of city limits to include uninhabited territory, *Pleasant Grove* v. *United States,* 479 U. S. 462, 467 (1987), even though these changes might, at first blush, appear to be "insignificant." The District Court mistakenly blurred the distinction between whether a change is subject to preclearance, which turns on whether the change has the potential for discrimination, and whether the change should, in fact, be precleared, which turns on whether

tion of the Road Supervision Resolution as a change with a "potential for discrimination" that was "blatant and obvious," App. to Juris. Statement of Appellant Presley 20a, and that should be enjoined unless subjected to § 5 preclearance, *id.*, at 21a, 23a, applies equally to the Common Fund Resolution. Both resolutions diminished the decisionmaking authority of the newly elected black commissioner, and both were passed on the same day and in response to the districting changes effected by the consent decree.[23]

---

the change would have a discriminatory purpose or effect. The distinction is important because "[t]he discriminatory potential in seemingly innocent or insignificant changes can only be determined after the specific facts of the change are analyzed in context. The present coverage formula allows for such a factual analysis." Hearings on Extension of the Voting Rights Act before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 97th Cong., 1st Sess., 2122 (1981) (testimony of Drew Days, Professor, Yale Law School and former U. S. Assistant Attorney General, Civil Rights Division, Department of Justice); see H. R. Rep. No. 97–227, p. 35 (1981); *NAACP* v. *Hampton County Election Comm'n*, 470 U. S., at 176, n. 21.

[23] The District Court approved a consent decree that provided, *inter alia*, for an increase in the number of Etowah County Commissioners in order to remedy the unlawful dilution of black voting strength caused by the prior at-large election system. See *Dillard* v. *Crenshaw County*, Civ. Action No. 85–T–1332–N (MD Ala., Nov. 12, 1986); *ante*, at 496. The decree expanded the Commission to six members, all of whom would eventually be elected from single-member districts. See App. to Juris. Statement of Appellant Presley 5a. The consent decree specified that the commissioners elected in 1986 were to have the same duties as the four holdover commissioners. *Ibid.* (decree provided that the two new commissioners "'shall have all the rights, privileges, duties and immunities of the other commissioners, who have heretofore been elected at large'"). In August 1987, however, the commission passed the Road Supervision Resolution, which authorized the four holdover commissioners to continue to exercise authority over road operations in their districts, but which assigned nonroad duties to the two new commissioners. *Id.*, at 6a. On the same day, the same commission adopted a second resolution, the Common Fund Resolution, which abolished the practice of allocating road funds to districts and created a common fund, thus transferring authority for determining funding priorities from the individual commissioners to

At the very least, I would hold that the reallocation of decisionmaking authority of an elective office that is taken (1) after the victory of a black candidate, and (2) after the entry of a consent decree designed to give black voters an opportunity to have representation on an elective body, is covered by §5.

Similar considerations supported the Court's decision in *Dougherty County Bd. of Ed.* v. *White*, 439 U. S. 32 (1978). *Dougherty* involved a rule requiring an employee of the school system to take a leave of absence while running for, or holding, a public office. The Court recognized that the rule in question operated in effect as a filing fee, hitting hardest those who were least able to afford it, and that it implicated the political process to the same extent as had changes in the location of polling places, *Perkins* v. *Matthews*, 400 U. S. 379 (1971), and alterations in the procedures for casting a write-in vote, *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969). The *Dougherty* Court also observed that the circumstances surrounding the rule's adoption were "sufficiently suggestive of the potential for discrimination to demonstrate the need for preclearance." 439 U. S., at 42. The rule had been adopted by an area with a long history of racial discrimination in voting, after the first black to seek public office announced his candidacy. *Ibid.* In the Etowah County case, as in *Dougherty*, the circumstances surrounding the adoption of the resolutions are similarly suggestive of the potential for discrimination and should require §5 preclearance.

---

the entire commission. *Id.*, at 6a–7a. However, the Common Fund Resolution contained a grandfather clause that permitted each holdover commissioner to maintain control over unspent funds for the 1986–1987 fiscal years, and a provision that required all 1987–1988 road maintenance to be done out of the " 'four present road shops.' " *Id.*, at 29a. Thus, the Common Fund Resolution, when combined with the Road Supervision Resolution, which gave the four holdover commissioners exclusive control over the road shops, meant that the four holdover commissioners could effectively have complete control over all road and bridge funds.

Although the test I propose here may not adequately implement § 5, it would certainly provide a workable rule that would result in the correct disposition of this case without opening the Pandora's box that the Court seems to fear.[24]

## III

The record indicates that the resolution challenged in the Russell County case may well have had a nondiscriminatory, anticorruption purpose.[25]  It would not be covered by the narrow standard that I have proposed as a "workable rule" for deciding the Etowah County case.  I would, however, adopt a broader standard that would require preclearance in this case as well.  The proper test, I believe, is suggested by the examples of resistance to the increase in black registration that were noted in our opinion in *Perkins* v. *Matthews, supra.*[26]

---

[24] The Court is strangely silent about the first half of the Etowah County majority's response to the election of Commissioner Presley.  The logic of its analysis would lead to the conclusion that even the Road Supervision Resolution is not covered by § 5, but one cannot be sure because the Court recognizes that an otherwise uncovered enactment "might under some circumstances rise to the level of a *de facto* replacement of an elective office with an appointive one."  *Ante,* at 508.  Despite the Court's overriding interest in formulating "workable rules to confine the coverage of § 5 to its legitimate sphere," *ante,* at 506, the scope of that exception must await future cases.

[25] According to one judge on the three-judge District Court, the change "was adopted to eliminate a practice that had proved inefficient and conducive to abuses . . . [and] eventually resulted in a criminal indictment of one of the commissioners."  App. to Juris. Statement of Appellant Presley 25a (Hobbs, J., concurring).

[26] In addition to the comment by Congressman McCulloch quoted, *supra,* at 519–520, the Court also quoted from a then recent study of the operation of the Voting Rights Act by the United States Civil Rights Commission, as follows:

" 'The history of white domination in the South has been one of adaptiveness, and the passage of the Voting Rights Acts and the increased black

Changes from district voting to at-large voting, the gerrymandering of district boundary lines, and the replacement of an elected official with an appointed official all share the characteristic of enhancing the power of the majority over a segment of the political community that might otherwise be adequately represented. A resolution that reallocates decisionmaking power by transferring authority from an elected district representative to an official, or a group, controlled by the majority, has the same potential for discrimination against the constituents in the disadvantaged districts.[27] The Russell County Resolution satisfies that test, and therefore, like both Etowah County Resolutions, should have been precleared. To hold otherwise, as the Court does today, leaves covered States free to evade the requirements of § 5, and to undermine the purpose of the Act, simply by transferring the authority of an elected official, who happens to be black, to another official or group controlled by the majority.

The Court today rejects the Attorney General's position that transfers of authority are covered under § 5 when "they

---

registration that followed has resulted in new methods to maintain white control of the political process.

"'For example, State legislatures and political party committees in Alabama and Mississippi have adopted laws or rules since the passage of the act which have had the purpose or effect of diluting the votes of newly enfranchised Negro voters. These measures have taken the form of switching to at-large elections where Negro voting strength is concentrated in particular election districts, facilitating the consolidation of predominantly Negro and predominantly white counties, and redrawing the lines of districts to divide concentrations of Negro voting strength.'" *Perkins* v. *Matthews*, 400 U. S., at 389.

[27] In Russell County, the voters continue to elect county commissioners, but the most significant power previously held by those commissioners has been shifted to the county engineer, who is appointed by the Commission. The effect of this change, as in *Bunton* v. *Patterson*, 393 U. S., at 550–551 (change in which office is made appointive rather than elective is subject to § 5 preclearance), and *McCain* v. *Lybrand*, 465 U. S., at 250, n. 17, was less power for the voters over local affairs.

implicate the decisionmaking authority of elected officials." *Ante*, at 509. It does so because it fears that such a rule creates line-drawing problems and moves too far afield from "voting." Whether or not the rationale advocated by the Attorney General in this case is appropriate, his judgment concerning the proper disposition of these two cases is unquestionably correct.

I would therefore reverse in both cases.