**STATE OF TEXAS, Plaintiff,**

**v.**

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 94–465 (JWR, JHG, NHJ).**

United States District Court, District of Columbia.

Oct. 20, 1994.

Gregg A. Cooke, Environmental Protection Div., Renea Hicks, Atty. General's Office of Texas, Austin, TX, for State of Tex.

Todd Anthony Cox, Delora L. Kennebrew, Steven H. Rosenbaum, John Kent Tanner, Elizabeth Johnson, Cal G. Gonzales, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, for the U.S.

Gilberto Mario Moreno, Mexican American Legal Defense & Educational Fund, Washington, DC, Judith Sanders–Castro, San Antonio, TX, pro hac vice, for League of United Latin American Citizens (Lulac), Dist. 15.

Andrew Tanner Karron, Robert Neil Weiner, Arnold & Porter, Washington, DC, for Edwards Underground Water Dist., amicus.

Before ROGERS, Circuit Judge, and NORMA HOLLOWAY JOHNSON and JOYCE HENS GREEN, District Judges.

## MEMORANDUM OPINION AND ORDER

Plaintiff, the State of Texas ("Texas" or "State"), commenced this action on March 9, 1994 against the United States pursuant to Section 5 of the Voting Rights Act of 1965, codified as amended at 42 U.S.C. § 1973c ("Section 5"). Texas properly requested that a three-judge Court be convened pursuant to 28 U.S.C. § 2284. This Court subsequently permitted the League of United Latin American Citizens ("LULAC") to intervene as a party defendant.[1]

Texas asks for alternative declaratory relief with respect to Senate Bill 1477 of the

---

1. The Edwards Underground Water District was permitted to take part as *amicus curiae* after its motion to intervene was denied.

Texas legislature, popularly known as the Edwards Aquifer Authority Act ("S.B. 1477" or "Act"). It seeks preclearance for all parts of S.B. 1477 not already precleared by the Attorney General of the United States. In the alternative, it requests that section 1.41 of the Act, which abolishes the Edwards Underground Water District ("EUWD"), be precleared and that all other parts of S.B. 1477 not already precleared be declared outside the purview of Section 5's preclearance requirements.

Presently pending is Texas' motion for summary judgment. The United States, LULAC and the EUWD filed pleadings in opposition, and the State filed a reply. Oral argument was heard on October 5, 1994. For the reasons expressed below, this motion is denied.

## I. *Background*

The Edwards Aquifer ("Aquifer") is a 175–mile long underground body of water that provides ground water to arid portions of south central Texas. Users of the Aquifer are divided into three basic groups: (1) farmers in Uvalde and Medina counties, which are located over the Aquifer on its western end, (2) municipal users in Bexar County, which is centrally located over the Aquifer, and (3) municipal, industrial, and agricultural users in eastern counties serviced by rivers fed from the Comal and San Marcos springs, which are located at the Aquifer's eastern edge and are fed by the Aquifer. These counties include Comal, Hays, Caldwell, Guadalupe, Frio, Atascosa and Wilson.

The counties most directly affected by the Aquifer have created four districts to regulate the water in the Aquifer. The EUWD was established by special legislation in 1959 as a state regulatory body to govern the five counties situated above the Aquifer: Bexar, Comal, Hays, Medina and Uvalde. Medina and Uvalde counties withdrew from the EUWD in 1989, and created the Medina County Underground Water Conservation

District ("MCUWCD") and the Uvalde County Underground Water Conservation District ("UCUWCD"), respectively. In addition, the Evergreen Underground Water Control District ("Evergreen UWCD") was created by special legislation in 1965 and operates in Frio, Atascosa and Wilson counties.

After the withdrawal of Medina and Uvalde counties, the EUWD was governed by a twelve-member board, four of whom were elected from single-member districts in Bexar County[2], two at-large from Bexar County, three at-large from Comal County, and three at-large from Hays County. Subsequently, the EUWD was the subject of a lawsuit brought by Hispanic and African–American voters[3] pursuant to Section 2 of the Voting Rights Act. On May 5, 1994, a consent decree was entered in *Williams* providing that the EUWD be governed by a twelve-member board elected from six single-member districts in Bexar County, three single-member districts in Comal County and three single-member districts in Hays County. This new election system was approved by the Attorney General of the United States on July 26, 1994 and is presently being implemented. The first election will be held on November 8, 1994, but several years will pass before the full new system will be in place.

Around 1989, environmental groups and interests dependent on the Comal and San Marcos springs began to complain that low water levels in the Aquifer decreased the water flow in the springs, thereby threatening or killing several endangered species. In May 1991, the Sierra Club and other environmental interests filed suit against the United States Secretary of the Interior and the United States Fish and Wildlife Service ("USFWS")[4]. The gravamen of the complaint was that by failing to insure adequate water levels in the Aquifer and, therefore, the springs, the federal government had failed to protect certain endangered species.

2. Two of these districts have majority Hispanic voting age populations.

3. This action is captioned *Williams v. Edwards Underground Water District*, No. SA–92–CA–144, in the United States District Court for the Western District of Texas, San Antonio Division.

4. That action is captioned *Sierra Club v. Babbitt*, No. MO–91–CA–069, and is pending in the United States District Court for the Western District of Texas, Midland–Odessa Division.

Subsequently, three state agencies intervened in this action and were aligned as defendants.

In February 1993, following a bench trial, Judge Lucius D. Bunton, III, found violations of the Endangered Species Act. Judge Bunton directed the USFWS to develop and disseminate information about the spring-flows necessary to sustain the endangered species in the Comal and San Marcos springs. In addition, the court directed one of the state agencies to prepare a comprehensive management plan for the Aquifer. Judge Bunton invited the Sierra Club to move for further relief after the 1993 session of the Texas legislature if no regulatory plan were in place.

Primarily in response to that Court's directives, the Texas legislature passed S.B. 1477 on June 11, 1993. The principal creation of the Act is the Edwards Aquifer Authority ("EAA"), which would govern the Aquifer in the counties of Atascosa, Bexar, Caldwell, Comal, Guadalupe, Hays, Medina and Uvalde. The EAA will regulate the use, reuse, and conservation of water within or withdrawn from the Aquifer, and it must develop comprehensive management and critical period management plans for the Aquifer. The nine-member board of directors that would govern the EAA—all of whom would be appointed [5]—will have the power to issue orders, including the assess-ment of administrative penalties, and may seek civil injunctions to enforce its powers.

The Act also repeals the statutory authority for the EUWD and abolishes the EUWD. All files and assets of the EUWD are transferred to the EAA, and the EAA is to be substituted as a party in any litigation in which the EUWD is presently involved.[6]

Texas submitted S.B. 1477 to the United States Department of Justice ("DOJ") for administrative preclearance under Section 5. On November 19, 1993, DOJ issued two letters in response, one of which objected to S.B. 1477 "insofar as it replaces the previously elected governing body with an appointed board." [7] Because the State was uncertain whether DOJ objected to the abolition of the EUWD or the creation of the EAA, representatives of the State and DOJ met on December 20, 1993 to seek clarification. On December 30, Texas sent a letter to DOJ restating Texas' basic view that the creation of the EAA falls outside Section 5.

By order dated February 25, 1994, the *Sierra Club* court appointed a monitor and imposed federal court regulation over the Aquifer. This order is premised in large part on the State's failure to implement a satisfactory regulatory system and will remain in effect until the State implements an adequate plan.

Texas thereafter, on March 9, 1994, commenced this action. It requests that the

---

5. The board would be comprised of one member appointed by the South Central Texas Water Advisory Committee, a committee created by S.B. 1477; two members appointed by the governing body of the City of San Antonio; one member appointed by the Commissioners Court of Bexar County; one member appointed by the Commissioners Court of Comal County; one member appointed by the governing body of the City of San Marcos; one member appointed by the governing body of the MCUWCD; one member appointed by the governing body of the UCUWCD; and one member appointed on a rotating basis by the governing body of the Evergreen UWCD, the MCUWCD or the UCUWCD.

6. Section 1.41 of S.B. 1477 provides, in pertinent part:

REPEALER; TRANSFERS; RULES. (a) Chapter 99, Acts of the 56th Legislature, Regular Session, 1959 ... is repealed, and the [EUWD] is abolished.

(b) All files and records of the [EUWD] pertaining to control, management, and operation of the district are transferred from the [EUWD] to the [EAA] on the effective date of this article.
(c) All real and personal property, leases, rights, contracts, staff, and obligations of the [EUWD] are transferred to the [EAA] on the effective date of this article.
(d) On September 1, 1993, all unobligated and unexpended funds of the [EUWD] shall be transferred to the [EAA].

\* \* \* \* \* \*

(f) The [EAA] shall be automatically substituted for the [EUWD] in any judicial or administrative proceeding to which, on the effective date of this article, the [EUWD] is a party.

7. The Attorney General precleared S.B. 1477 insofar as it "pertains to the creation of the [UCUWCD] ... [and] requires the District to use five single-member districts to elect the board of directors."

Court give S.B. 1477 Section 5 preclearance, declaring that it does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color or minority language status. Alternatively, Texas asks the Court to declare that Section 5 does not apply to any part of the Act except section 1.41, which abolishes the EUWD.

## II. *Discussion*

Texas seeks summary judgment on either of its alternative theories. Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### A. *Applicability of Section 5 to S.B. 1477*

■ The threshold issue raised in Texas' motion for summary judgment is whether S.B. 1477 [8] effects a change "with respect to voting" within the meaning of Section 5. 42 U.S.C. § 1973c. If the change is covered by Section 5, the Voting Rights Act requires that either the Attorney General or this Court preclear S.B. 1477 before its implementation. *See Clark v. Roemer*, 500 U.S.

646, 652, 111 S.Ct. 2096, 2101, 114 L.Ed.2d 691 (1991); *Texas v. United States,* 785 F.Supp. 201, 203 (D.D.C.1992) (three-judge court). On the other hand, if S.B. 1477 is not covered by Section 5, Texas may implement it immediately. *Texas v. United States,* 785 F.Supp. at 203.

The Supreme Court of the United States first addressed the question of Section 5 coverage in *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), a series of cases arising out of Mississippi and Virginia election laws and regulations. *Id.* at 547–48, 89 S.Ct. at 822–23. In *Allen,* the Court emphasized that the Voting Rights Act "implemented Congress' firm intention to rid the country of racial discrimination in voting." *Id.;  see South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

■ Toward this end, the Court "rejected a narrow construction" that would limit Section 5 to voter qualification regulations and "held that the section applies ... to state rules relating to the qualifications of candidates and to state decisions as to which offices shall be elective." *Presley v. Etowah County Comm'n,* 502 U.S. 491, ——, 112 S.Ct. 820, 827, 117 L.Ed.2d 51 (1992); *see Allen,* 393 U.S. at 565, 89 S.Ct. at 831 ("The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race"); *see also City of Lockhart v. United States,* 460 U.S. 125, 131, 103 S.Ct. 998, 1002, 74 L.Ed.2d 863 (1983) (Section 5 applies to addition of seats to city commission); *City of Rome v. United States,* 446 U.S. 156, 161, 100 S.Ct. 1548, 1553, 64 L.Ed.2d 119 (1980) (Section 5 governs annexation); *Georgia v. United States,* 411 U.S. 526, 531, 93 S.Ct. 1702, 1706, 36 L.Ed.2d 472 (1973) (Section 5 covers replacement of single-member districts with multi-member districts). This broad construction furthers Congress' intent "to reach any state enactment which altered the election law of a covered State in even a minor

---

8. Texas concedes that section 1.41 of S.B. 1477, which abolishes the EUWD, is covered by Section 5. It argues, however, that the remainder of the Act does not bring about a change "with respect to voting" sufficient to be covered by Section 5.

way." *Allen*, 393 U.S. at 566, 89 S.Ct. at 832.[9]

■ Notwithstanding this sweeping interpretation, Section 5 does not have universal applicability. In *Presley*, the Court noted that Section 5 covers "changes in election procedures" and "substantive changes as to which offices are elective." 502 U.S. at ——, 112 S.Ct. at 828. The Court emphasized that these categories of voting changes must have "a direct relation to voting and the election process." *Id.* at —— – ——, 112 S.Ct. at 828–29. Changes such as those at issue in *Presley*—those that concern only "the allocation of power among government officials"— are not covered by Section 5. 502 U.S. at ——, 112 S.Ct. at 832.

The State argues that S.B. 1477, with the exception of section 1.41, falls within the province of *Presley*. It asserts that the Act creates the EAA as a new governing body for the Aquifer. Texas' position is based on the fact that the geographic range and regulatory power of the EAA exceed those of the EUWD. For the areas not governed by the EUWD, either because the area is not located within the EUWD's boundaries or because the specific power was beyond the authority granted the EUWD, Texas argues that S.B. 1477 is simply not "a procedure with respect to voting" within the meaning of Section 5. *See Presley*, 502 U.S. at ——, 112 S.Ct. at 832 ("[c]overed changes must bear a direct relationship to voting itself").

From this conclusion, the State avers, two consequences flow. First, the EAA should be permitted to exercise its full powers in those areas outside the geographic reach of the EUWD but within the EAA's boundaries. Second, in those areas within the geographic reach of both the EAA and the EUWD, the EAA should be permitted to exercise those powers that have not been allocated to the EUWD. These powers, according to Texas, constitute merely the State's award of power that was heretofore not allocated.

The State concedes that the Section 5 coverage question is more difficult for those areas in which the powers of the EAA and the EUWD overlap. Texas argues, however, that S.B. 1477 should be analyzed as a statute that creates a new regulatory entity separate from the abolition of the existing governing body, therefore not implicating Section 5. The primary factual basis for this argument is that prior to the creation of the EAA, the Aquifer was governed by four distinct water districts, which had limited powers and imposed few regulations. In contrast, the EAA has unified authority over the Aquifer—it has "teeth" as described by Texas' counsel at oral argument—and leaves three of the original water districts undisturbed.

If anything, the State posits, the EAA may only be a *de facto* replacement for the EUWD, and the Court in *Presley* left unanswered the question of the application of Section 5 to a *de facto* replacement. *See* 502 U.S. at ——, 112 S.Ct. at 831. Any analysis of a *de facto* replacement, however, according to the State, would be premature because the EAA is not functional and there is no way to determine whether it will operate as a *de facto* replacement for the EUWD.

Defendants [10] dispute almost all of Texas' contentions. They assert that *Bunton v. Patterson*, one of the cases decided in the *Allen* opinion, settles the issue of Section 5 coverage. In *Bunton*, the Supreme Court examined a Mississippi law that changed an office in certain counties from an elected

---

9. Indeed, *Allen* involved four distinct cases, each of which was covered by Section 5. 393 U.S. at 569, 89 S.Ct. at 833. The first, *Allen* itself, involved a change in the procedures for the casting of write-in ballots. *Id.* at 570–71, 89 S.Ct. at 834–35. The second, *Whitley v. Williams*, concerned changes in the requirements for independent candidates seeking office in general elections. *Id.* at 551, 570, 89 S.Ct. at 824, 834. *Fairley v. Patterson*, the third case, arose out of a change from single-district voting to at-large voting. *Id.* at 550, 569, 89 S.Ct. at 824, 833. Finally, in *Bunton v. Patterson*, a statute provided for the appointment of officials who had previously been elected. *Id.* at 550–51, 569–70, 89 S.Ct. at 823–24, 833–34. *See Presley*, 502 U.S. at ——, 112 S.Ct. at 828.

10. The reference to "Defendants" refers to the United States, LULAC and the EUWD, the *amicus*. All three raised substantially identical arguments in their pleadings and will be treated herein as one group.

position to an appointed position. The Court concluded that:

The power of a citizen's vote is affected by this amendment; after the change, he is prohibited from electing an officer formerly subject to the approval of the voters. Such a change could be made either with or without a discriminatory purpose or effect; however, the purpose of § 5 was to submit such changes to scrutiny.

393 U.S. at 569–70, 89 S.Ct. at 834; *see Robinson v. Alabama State Dep't of Educ.*, 652 F.Supp. 484 (M.D.Ala.1987).

*Bunton* applies, argue Defendants, because the creation of the EAA cannot be considered in isolation from the abolition of the EUWD. The proper analysis focuses on the *replacement* of the EUWD with the EAA, which is covered by Section 5. *See Georgia v. United States*, 411 U.S. at 531, 93 S.Ct. at 1706 ("Section 5 is not concerned with a simple inventory of procedures, but rather with the reality of changed practices as they affect [minority] voters.").

Defendants assert that one simple fact compels this conclusion: there is only one Aquifer and its regulation is the "reason for being" for both of these boards. United States' Memorandum in Opposition to Texas' Motion for Summary Judgment at 14. Moreover, S.B. 1477 provides for the transfer of complete control over the Aquifer from the EUWD to the EAA and the EAA will assume all liabilities and obligations of the EUWD.[11] Geographically, Defendants assert that the coverage of the two entities is "substantially the same," and that any slight differences are insufficient to take this case out of Section 5. *Id.* at 16 n. 8, 17. Defendants further argue that the State has greatly underestimated the powers available to the EUWD.

■ We agree with Defendants that Section 5 applies to those portions of S.B. 1477 not administratively precleared. *Bunton* and *Presley* mandate that the replacement of an elected body to an appointed one is a covered change under Section 5. The only inquiry presented in the instant case, therefore, is whether the EAA is properly considered a replacement for the EUWD.

■ It is. Several factors compel this conclusion. First, there is significant overlap in the geographic range and regulatory power afforded the two boards. Although it is true that the geographic coverage of the EAA is broader [12] and the EAA has more expansive powers than the EUWD [13], the coverage so extensively overlaps as to make meaningful differentiation impossible. In any event, a dispute regarding these issues would clearly preclude summary judgment. Second, and more fundamentally, section 1.41 of the Act transfers all files and records of the EUWD "pertaining to control, management, and operation" of the Aquifer to the EAA; transfers all "real and personal property, leases, rights, contracts, staff, and obligations" of the EUWD to the EAA; transfers all otherwise unobligated or unexpended funds of the EUWD to the EAA; and substitutes the EAA for the EUWD "in any judicial or administrative proceedings to which . . . the [EUWD] is a party." It is difficult to conceive of a legislative scheme that would more thoroughly replace an existing body.[14] We conclude, accordingly, that Section 5 applies to those portions of the Act that the Attorney General has not precleared.

**B. *Section 5 Analysis***

The State must prove that S.B. 1477 "does not have the purpose and will not have the effect of denying or abridging the right to

---

11. *See supra* note 6.

12. The total population of the area governed by the EUWD is 1,261,098; the EAA would govern an area of 1,368,402 persons.

13. For example, the EAA has the power to prohibit pumping from the Aquifer. The EUWD does not. *Compare* S.B. 1477 § 1.16(b) *with* EUWD Act § 3A. *See* Texas' Motion for Summary Judgment at 8–9.

14. It also appears that section 1.42 of S.B. 1477 effectively abolishes the other three water conservation districts. *See* S.B. 1477 § 1.42(b) ("An underground water conservation district other than the [EAA] may manage and control water that is a part of the aquifer to the extent that those management activities do not conflict with and are not duplicative of this article").

vote on account of race or color or" membership in a language minority group. 42 U.S.C. §§ 1973c, 1973b(f)(2); *see Texas v. United States*, 785 F.Supp. at 203.

### 1. The "Purpose" Prong

The "purpose" prong requires the State to show that S.B. 1477 "is free of a discriminatory purpose." *Id.; see City of Richmond v. United States*, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975). In evaluating this prong, it is noteworthy that proof of discriminatory purpose may be circumstantial, *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976), and that it need not be shown that the discriminatory purpose was a primary motivation of the legislation, so long as it was a motivating factor. *See Rogers v. Lodge*, 458 U.S. 613, 618, 102 S.Ct. 3272, 3276, 73 L.Ed.2d 1012 (1982).

Texas makes a three-fold argument to support its position that S.B. 1477 does not have a discriminatory purpose. It claims that S.B. 1477 was enacted in response to a court order. Further, Texas argues that every Hispanic member of the State Senate and 23 of the 25 Hispanic members of the State House of Representatives voted in favor of S.B. 1477. Finally, Texas asserts that Interior Secretary Babbitt endorsed a similar proposal that was the precursor to S.B. 1477 and that Housing and Urban Development Secretary Cisneros wrote DOJ urging the preclearance of S.B. 1477 and stating that it did not have a discriminatory purpose.

Defendants argue that S.B. 1477 clearly had a discriminatory purpose. They challenge Texas' assertion that S.B. 1477 is purely the result of orders in the *Sierra Club* litigation because no court order required the State to replace an elected board with an appointed one. In addition, several state legislators submitted declarations that indicate that they were aware of the discriminatory nature of the Act when they adopted it. Lastly, the United States argues that the declarations of Secretary Babbitt and Secretary Cisneros have no probative value in determining the purpose of the Texas legislature in passing a bill.

An inquiry into purpose or intent is particularly unsuitable for resolution by summary judgment. *See Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir.1988) (summary judgment "test remains particularly rigorous when the disputed issue turns on motive or intent"); *see also* Charles A. Wright, *et al.*, *Federal Practice and Procedure* § 2730 at 238 (2d ed. 1983 & Supp.1994) ("a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable [people] might differ"). This case is no exception to this general rule. As the State concedes, Judge Bunton did not require the State to create an entity governed by appointed officials. Moreover, there is evidence that several Texas legislators believed that the Act had a discriminatory purpose at the time of its passage. Texas' motion for summary judgment will be denied because genuine issues of material fact exist as to the purpose of S.B. 1477.

### 2. The "Effects" Prong

The "effects" prong requires the State to show that S.B. 1477 "does not lead to retrogression in the position of racial minorities." *Texas v. United States*, 785 F.Supp. at 203; *see Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976). In *Beer*, the Supreme Court enunciated the "no retrogression" rule. This rule mandates that preclearance be denied under the "effects" prong of Section 5 if a new system places minority voters in a weaker position than the existing system. *Id.*

The State argues that the "effects" prong of Section 5 does not apply. Texas asserts that retrogression will always be present if an elected system is replaced with an appointed system because minority voters will always have diminished voting power, *i.e.* it will be reduced to zero. Consequently, the State claims, Congress could not have intended to establish Section 5's "effects" prong as a prohibition on eliminating elected offices. Texas also contends that even if the "effects" prong is applicable, no retrogression exists. The State asserts that two of the twelve positions on the EUWD board were subject

to minority control and the remaining ten were subject to the control of white voters. S.B. 1477, however, takes all electoral power away from everyone, thereby placing minority voters on equal footing with white voters—a better position than they were in before. The State adds that its expert compared the minority voting power in the current system with the minority voting power in electing the entities appointing the governors under the new system and concluded that Hispanic voters would choose two of the nine members of the EAA, instead of two of the twelve EUWD members.

Defendants challenge Texas' assertion that the "effects" prong of Section 5 is inapplicable to a case in which an elected body is replaced with an appointed one. As to Texas' argument that such a change will always be retrogressive, the defendants point out that the corollary to that argument is that a change from an appointed body to an elected one will never be retrogressive, a result rejected in *County Council of Sumter County v. United States,* 555 F.Supp. 694 (D.D.C. 1983) (three-judge court). Defendants observe that Texas uses the wrong benchmark in its Section 5 "effects" analysis when comparing the "effects" of S.B. 1477 with the governance of the EUWD prior to the consent decree in *Williams* because the consent decree was entered after the passage of S.B. 1477. The appropriate benchmark for an "effects" analysis, Defendants emphasize, is the plan that would be implemented were the election held today. *See Texas v. United States,* 785 F.Supp. at 204; *County Council of Sumter County,* 555 F.Supp. at 705.

■ Again, it is clear that summary judgment must be denied. The "effects" prong cannot be read out of the statute. To accept the State's argument that the "effects" prong does not apply to the replacement in this case would be to ignore the clear statutory mandate that "effect" be analyzed. 42 U.S.C. § 1973c. The State's position disregards the fact that retrogression can be evaluated by examining the power of minority voters to elect the officials who appoint the members of the EAA.

Finally, any comparison of the rights of minority voters under S.B. 1477 must be made with the *Williams* consent decree. *See Texas v. United States,* 785 F.Supp. at 205 (noting that the plan "in effect" is the appropriate benchmark); *see also Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2587, 129 L.Ed.2d 687 (1994) (plurality opinion) ("the proposed voting practice is measured against the existing voting practice"). This conclusion is compelled not only by case law, but by the language of the statute, which provides that the State must demonstrate that the new plan "will not have the effect" of discriminating against minorities. 42 U.S.C. § 1973c. This prospective language necessarily requires an examination of the impact of the new statute were an election held today. Such an examination is fact intensive and cannot be resolved on summary judgment.

### III. *Conclusion*

For the reasons expressed above, we conclude that Section 5 applies to S.B. 1477. Having reached this conclusion, genuine issues of material fact abound regarding application of Section 5 to S.B. 1477, thereby precluding summary judgment. Accordingly, it is hereby

ORDERED that Texas' Motion for Summary Judgment is denied.

IT IS SO ORDERED.