478 F.3d 117
 CHAUFFEUR'S TRAINING SCHOOL, INC., Plaintiff-Counter-Defendant-Appellant,
v.
Margaret SPELLINGS, as Secretary of the United States Department of Education,* United States Department of Education, Defendant-Counter-Claimant-Appellees.
 Docket No. 04-6385-cv(Lead).
 Docket No. 04-6489-cv(Con).
 United States Court of Appeals, Second Circuit.
 Argued: March 22, 2006.
 Decided: February 21, 2007.
 
 Keith J. Roland, Roland, Fogel, Koblenz & Petroccione, LLP, Albany, NY, for Plaintiff.
 Sarah Wanner, Office of General Counsel, United States Department of Education (Brenda K. Sannes, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney for the Northern District of New York, on the brief), United States Attorney's Office for the Northern District of New York, of counsel), for Defendant.
 Before LEVAL, PARKER, Circuit Judges, and SESSIONS, District Judge.**
 LEVAL, Circuit Judge.
 
 
 1
 Plaintiff Chauffeur's Training School, Inc. (the "School") appeals from rulings of the United States District Court for the Northern District of New York (McAvoy, J., and Sharpe, J.) holding the plaintiff liable to the United States Department of Education[1] for $1,279,333 in damages. In so ruling, the district court enforced the order of the Department entered in an administrative proceeding imposing liability on the School. The court denied the School's challenge under the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA"), to the Department's order, ruling that the Department was authorized to conduct an administrative proceeding to assess liability against the School. The court further gave collateral estoppel effect to the administrative determination of liability in adjudicating the Department's claim for damages.
 
 
 2
 The case arises out of the School's participation in federal loan programs, pursuant to which its students received financial aid, including bank loans which are guaranteed by a guaranty agency and in turn insured[2] by the government, to pay the costs of attending the School. To participate in these programs, schools are responsible for processing student loan applications and certifying that the applications are complete and accurate. Eligible students with complete, accurate applications receive loans from private lenders and use the funds to pay tuition and other school expenses. The Department pays subsidies and special allowances to lenders for the student loans, including, for example, the interest accruing on the loan while the student is enrolled. The Department also insures the loans, so that if a student defaults, and neither the lender nor guaranty agency succeed in collecting, the Department reimburses the guaranty agency for its payment of the guarantee.
 
 
 3
 The School violated loan program requirements by certifying loan applications that were incomplete or inaccurate. Upon discovering these violations by reviewing a sample of the School's student files, the Department conducted an administrative proceeding to recover funds it paid as insurer of the loans. In the proceeding, an Administrative Law Judge ("ALJ") found the School liable to the Department by reason of its program violations. Because the School failed to submit documentation to be reviewed for many of the student loan applications it processed and certified, the ALJ arrived at the amount owed to the Department by estimation. The Department argued for a liability of $28,223,842. The ALJ rejected the Department's estimate, imposing instead a $2,085,008 assessment. On remand, after the district court found this assessment violative of the APA, the ALJ imposed a liability of $1,279,333, which reflected an estimate of the total amount of funds the Department dispensed on improperly certified student loans. The district court entered judgment in that amount.
 
 
 4
 The School challenges under the APA several aspects of the administrative proceeding. It asserts that the Department lacked statutory authority to undertake an administrative proceeding to assess liability for loan program violations. The School also challenges the decision of the district court to give collateral estoppel effect to the administrative findings. For the reasons set forth below, we reject both challenges and affirm the rulings of the district court. With respect to the Department's statutory authority to institute administrative proceedings to assess a liability for loan program violations, we find that the applicable statutory scheme, Title IV of the Higher Education Act, is silent. The statute neither explicitly authorizes nor prohibits such proceedings. In the absence of clear congressional guidance on the question, we defer to the Department's interpretation that Title IV authorizes it to assess such a liability, as the Department is charged with administering the statutory scheme, and its interpretation is reasonable. With respect to collateral estoppel, we reject the School's contention that the administrative proceeding denied the School sufficient opportunity for full and fair litigation of the issues.
 
 Background
 I. Factual History
 
 5
 The School (now defunct) was a vocational trade school offering tractor-trailer driving instruction at seven campuses located in Michigan, Florida, Illinois, New York, and Texas. Until September 1991, the School participated in federal student loan programs under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 to 1099c-2 ("Title IV").[3] Title IV provides the statutory scheme for Federal Family Education Loan programs ("FFEL programs"),[4] by which eligible students may receive financial assistance for higher education. See id. § 1071 to 1087-4. FFEL programs include, among other things, the Federal Stafford Loan program and the Federal Supplemental Loans for Students program. See id. §§ 1071(c), 1077, 1078. The purpose of these programs is to make available and subsidize student loans from private lenders with repayment insured by the government. See id. § 1071(a). Loans made pursuant to these programs are to be used to pay costs of attending school, such as tuition and living expenses. 34 C.F.R. § 682.100.
 
 
 6
 To qualify for financial assistance under the FFEL programs, a student must, among other things, attend an eligible institution. See 20 U.S.C. § 1091(a)(1). To be eligible, an institution must enter into a program participation agreement ("PPA") with the Department. See id. § 1094(a). A PPA incorporates regulations promulgated by the Department, which require an institution, inter alia, to administer student loan applications, determine whether students are eligible for particular financial assistance, certify that student loan applications are complete and accurate, and keep records necessary to administer the funds. See id. § 1094(a)(1)-(6).
 
 
 7
 The School signed a PPA in 1988, pursuant to which it participated in programs for its students to receive Stafford Loans and Supplemental Loans for Students, which were backed by guarantees of the Department. Under these programs, the School certified students as eligible to receive student loans. On that basis the students obtained loans from private banks, which loans were guaranteed by state or private non-profit guaranty agencies, see id. § 1078(b), which guarantees were, in turn, insured by the Department, see id. § 1078(c); 34 C.F.R. § 682.404. If a student failed to repay the loan, the lender and guaranty agency were required to take steps to try to collect repayment, see, e.g., 20 U.S.C. §§ 1078(c)(2)(A), 1080(a), and, upon completion of these steps without success, the guarantor was entitled to be indemnified by the Department for paying the defaulted loan, see id. § 1078(c). The Department also made payments to lenders covering the interest accrued while the student borrower attended school. See id. §§ 1078(a)-(b), 1087-1.
 
 
 8
 In December 1990 and January 1991, the Department conducted a program review of three of the School's seven campuses (those at Albany, Chicago, and Houston) pursuant to 20 U.S.C. § 1099c-1. The Department randomly sampled 187 student files and reviewed them for compliance with student loan eligibility requirements. The Department found widespread documentation in the files that did not comply with the requirements for certification of a student for a loan.[5] On May 21, 1991, the Department sent to the School a Program Review Report, documenting the instances of non-compliance found in the random sample and specifying actions the School was required to take. The Department required the School to review the financial aid files of every student who received Title IV aid and to submit a report within 60 days detailing whether each student's file complied with the several regulations found to be violated in the random sample. The School failed to submit a complete response.
 
 II. Procedural History
 A. The Final Program Review Determination
 
 9
 On August 27, 1992, the Department sent a Final Program Review Determination ("FPRD") to the School. In the FPRD, the Department imposed an assessment on the School of $28,223,842. This figure was based on the theory that, because of the pervasiveness of the School's violations, the School was not an eligible institution, with the consequence that every loan to its students constituted a violation. The figure consisted of the Department's estimate of the total of defaulted loans to the School's students, plus the amount of the Department's payment of subsidies and special allowances associated with those defaulted loans.[6]
 
 B. The First Administrative Hearing
 
 10
 The School sought a hearing for review of the FPRD. Pursuant to Department regulations, such a hearing to review a FPRD is a proceeding on papers, in which the institution and the Department submit written briefs and documentary evidence, such as loan records. See 34 C.F.R. § 668.116. The Department's rules make no provision for subpoenas or for oral testimony. A hearing official regulates the proceedings and issues the decision. See id. § 668.117. The institution has the burden of proving that it complied with program requirements. See id. § 668.116(d)(2).
 
 
 11
 The School and the Department submitted briefs and documentary evidence. The Department's position was that $28,223,842 represented its "actual losses." The School sought "evidentiary hearings so that the allegations, factual assertions and theories of the [Department] can be tested under cross-examination." The hearing official, Administrative Law Judge ("ALJ") Ernest C. Canellos, denied this request because Department regulations did not provide for such an oral hearing.
 
 
 12
 On September 9, 1994, the ALJ issued a written decision, which rejected the Department's position as to the amount of its loss, and imposed instead a much smaller liability of $2,085,008. The Department's theory was that the School's violations were so pervasive that it was not eligible for Title IV loans, so that all defaulted loans to the School's students were recoverable.[7] The ALJ rejected the Department's theory of pervasive violations and instead imposed liability for (an estimate of) all loans to ineligible students, regardless whether repaid. On July 11, 1995, the Secretary of Education certified the ALJ's decision as the final decision of the Department.
 
 C. Chauffeur's I
 
 13
 The School then brought suit in the Northern District of New York seeking judicial review of the Department's decision. On cross-motions for summary judgment the district court made three rulings pertinent to this appeal. See Chauffeur's Training School, Inc. v. Riley, 967 F.Supp. 719 (N.D.N.Y.1997) ("Chauffeur's I"). First, on the School's challenge to the Department's determination that the School violated Title IV program regulations, the court ruled that the Department's findings were not arbitrary and capricious. Id. at 725-26. Second, on the ALJ's calculation of liability, the court agreed with the School that the Department could not recover for all Title IV loans to ineligible students, because that figure included loans which were repaid by the student borrower, for which the Department's guarantee was never invoked. Id. at 727.
 
 
 14
 Having set aside the Department's ruling on the amount of the School's liability, the court remanded the case to the Department. In remanding, the court stated,
 
 
 15
 Plainly, under breach of contract principles, [the Department] is entitled to recover its actual damages associated with the ineligible GSL program loans, including, inter alia, reinsurance payments, claims paid upon defaulted loans, and interest and other subsidies paid to participating lenders. See 5 Corbin on Contracts § 1002 (1964). In addition, [the Department] may be able to recover civil penalties pursuant to 20 U.S.C. § 1094.
 
 
 16
 Id. at 727.
 
 
 17
 Finally, the court ruled the Department's estimation based on "statistical extrapolation" was permissible, id. at 728, and that the Department's procedures, which excluded the taking of testimony, did not deprive the School of statutory entitlements or constitutional due process, id. at 729-31.
 
 D. The Second Administrative Hearing
 
 18
 On remand, the ALJ applied a different methodology for calculating the School's liability and assessed damages of $1,279,333 to the Department. This award consisted of a statistically-based estimate of guarantee payments, subsidies, and special allowances paid by the Department on defaulted Title IV loans to ineligible students.[8] The Secretary of Education certified the ALJ's ruling as the final decision of the Department in January 2001.
 
 E. Chauffeur's II
 
 19
 In February 2001, the School filed a second complaint in the Northern District of New York, seeking to set aside the ALJ's second award. The Department counterclaimed, seeking a judgment in the amount of the liability found by the ALJ. The parties again cross-moved for summary judgment.
 
 
 20
 The district court first noted as to the Department's authority to assess a liability against the School in an administrative hearing that it had already decided this in the Department's favor in Chauffeur's I. The court then approved the methodology used by the ALJ to calculate the School's liability, and noted that any "weakness in the . . . methodology . . . was the result of Plaintiff's refusal to provide records which it agreed to . . . maintain." Chauffeur's Training School, Inc. v. Paige, No. 01-cv-0208, at *31-32 (N.D.N.Y. Sept. 30, 2003). Upon these and other rulings not at issue on this appeal, the court granted summary judgment for the Department, dismissing the School's complaint to set aside the administrative award.
 
 
 21
 The district court, however, denied summary judgment to the Department on its counterclaim for a judgment in the amount of the liability, because the parties had not adequately addressed the issue. The court granted leave to the parties to renew motions for summary judgment on this issue.
 
 F. Chauffeur's III
 
 22
 The parties again cross-moved for summary judgment on the Department's counterclaim. The district court characterized the issue as whether the School was collaterally estopped from contesting the Department's counterclaim. The court noted, "[I]t is clear that collateral estoppel may be invoked when an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had adequate opportunity to litigate. . . . [T]here must have been a full and fair opportunity afforded the litigants to contest the issue in the first action." Chauffeur's Training School, Inc. v. Paige, No. 01-cv-208, at *13-14 (N.D.N.Y. Oct. 21, 2004). On this basis, the court granted summary judgment for the Department in the amount of the liability determination made by the ALJ. It observed that arguments about the propriety and fairness of the administrative proceeding had already been resolved adversely to the School in the previous decisions of the district court. The court then entered judgment in the amount of the ALJ's award.
 
 
 23
 This appeal followed.
 
 DISCUSSION
 
 24
 The School argues that (1) the Department's administrative order finding it liable for approximately $1.3 million must be set aside under the Administrative Procedures Act ("APA"), and (2) the School should not have been estopped from relitigating the administrative award. For the reasons set forth below, we reject these arguments. We conclude that the governing statute authorized the Department to establish regulations providing for administrative determination of liability and damages of this nature, and that the district court committed no error in barring the School from relitigating the issues determined in the administrative proceeding.
 
 
 25
 I. The Administrative Determination of the School's Liability
 
 A. Statutory Authority
 
 26
 The School primarily contends the judgment must be set aside under § 706(2)(C) of the APA because the Department's determination of liability through an administrative hearing was not within its statutory authority. See 5 U.S.C. § 706(2)(C).[9] The Department responds that its authority to do so is clearly established in Title IV of the HEA, and that in any event its interpretation of these statutes is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 27
 The Supreme Court set forth the framework for "a court['s] review[ of] an agency's construction of the statute which it administers" in Chevron, 467 U.S. at 842-45, 104 S.Ct. 2778. Under this framework, a court defers to the statutory interpretation of an agency authorized to implement the statutory scheme if the interpretation is (1) not contrary to the clear intent of Congress and (2) reasonable. See id.; Presley v. Etowah County Comm'n, 502 U.S. 491, 508-09, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). Under Chevron, therefore, the first step is to determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778; see Dole v. United Steelworkers, 494 U.S. 26, 35, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) ("On a pure question of statutory construction, our first job is to try to determine congressional intent, using traditional tools of statutory construction." (internal quotation marks omitted)).
 
 
 28
 If the intent of Congress is not clear, the second step under Chevron is to determine whether deference to the agency's interpretation of the statute is appropriate. See Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778; Presley, 502 U.S. at 508, 112 S.Ct. 820. Courts defer to statutory interpretations of agencies when (1) the agency is charged with implementing the statutory scheme, and (2) its interpretation is reasonable. Envtl. Defense v. U.S. E.P.A., 369 F.3d 193, 200 (2d Cir.2004); see Chevron, 467 U.S. at 844, 104 S.Ct. 2778 ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").
 
 
 29
 Before addressing the School's arguments, we describe briefly some of the pertinent provisions of Title IV and related statutes. As discussed above, for its students to qualify for student loans under FFEL programs, a school must enter into a program participation agreement with the Department. See 20 U.S.C. § 1094(a). To be eligible under the agreement, the school must comply with requirements related to its administrative capability and financial responsibility, see, e.g., id. §§ 1085(a)(2), 1094(c)(1)(B), as well as requirements for the processing of student loan applications, and the use of program funds it ultimately receives, see, e.g., id. § 1094(a).
 
 
 30
 Congress has delegated responsibility for administering the HEA, including the FFEL programs under Title IV, to the Department. The Department has been granted broad rulemaking authority. It "may . . . prescribe such regulations as may be necessary" to carry out the purposes of Title IV. Id. § 1082(a)(1). Among the Department's tasks is monitoring schools' compliance with applicable regulations. To fulfill this task, the Department is authorized by the statute, among other things, to order a participating school to conduct an independent audit, see id. § 1094(c)(1)(A), or conduct a program review, see id. § 1099c-1.
 
 
 31
 The Department is also tasked with enforcing FFEL program requirements by taking remedial actions for failure to comply with program requirements. Title IV expressly identifies four remedial actions available to the Department in response to violations of program requirements. Section 1094(c) expressly authorizes the Department to limit, suspend, or terminate a school's participation in Title IV programs. Id. § 1094(c)(1)(F), (c)(3). It also authorizes the Department to assess civil penalties of up to $25,000 for each violation. Id. No statutory provision of Title IV expressly mentions assessment of liability against a participating school for damages resulting from violations of loan program requirements. "Program review determination," through which the Department assessed a liability,[10] is mentioned only once in Title IV. Section 1094(b), entitled "Hearings," provides that a school may seek review of a "program review determination," and that the Department must conduct a hearing to administer this review.[11] Although this provision of Title IV sets forth requirements for review of a program review determination, Title IV is silent on the content and scope of program review determinations, and does not specify what the Department may accomplish by issuing them. Congress, in short, expressly required the Department to conduct hearings to review program review determinations, but did not describe what a program review determination is.
 
 
 32
 Furthermore, the Department is expressly authorized to administer cost recovery actions for repayment of improperly disbursed grant funds. See 20 U.S.C. § 1234a. When a recipient of a grant "has made an expenditure of funds that is not allowable," § 1234a authorizes the Department to recover the misspent funds upon an administrative determination. Id. § 1234a(1). This provision makes no mention of loan programs, or the remedies available to the Department for expenditures it makes because of violations of the requirements of loan programs.
 
 
 33
 1. Chevron Step One: Whether Congress Manifested a Clear Intent to Prohibit Administrative Determinations of Liability for Violations of Loan Program Requirements
 
 
 34
 The School points to several statutory provisions which it contends exhibit a congressional intent to prohibit administrative determination of its liability. We find its arguments unconvincing.
 
 
 35
 a. Section 1094 — "Audits; financial responsibility; enforcement of standards." Section 1094(c) expressly authorizes the Department to limit, suspend, or terminate a school's participation in Title IV programs, and to assess a civil penalty of up to $25,000 for a violation of program requirements. See 20 U.S.C. § 1094(c)(1)(F), (c)(3)(B). In imposing any of these administrative sanctions, the Department must give notice to the school and an opportunity to request a hearing to challenge the determination. Id. The School contends that by its express, detailed authorization of these limited remedial actions, Congress clearly indicated an intent that the listed remedies be deemed exclusive. See Indep. Ins. Agents of Am. v. Hawke, 211 F.3d 638, 644 (D.C.Cir.2000) ("[W]here the context shows that the draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives, the canon [of expressio unius est exclusio alterius] is a useful aid." (internal quotation marks omitted)).
 
 
 36
 We are not persuaded that Congress, by describing some remedial actions available to the Department, intended to preclude the Department from taking other reasonable remedial actions. Title IV does not describe limitation, suspension, termination, and civil penalty as exclusive remedies, and express authorization to penalize schools for violations is not inconsistent with implied authorization to recover funds wrongly distributed as a result of violations. Cf. Career Coll. Ass'n v. Riley, 74 F.3d 1265, 1273-75 (D.C.Cir.1996) (finding that express authorization in one statute to terminate a school's participation in loan programs for excessive cohort default rates (after providing certain procedural protections) did not render impermissible the Department's interpretation that it may take essentially the same action (without providing procedural protections) under another statute which is silent on the issue). Furthermore, in § 1082(a)(1), as noted above, Congress gave the Department broad authority to promulgate regulations necessary to carry out the purposes of Title IV. We think it would be unreasonable to view the specification of remedies set forth in § 1094(c) as exclusive.
 
 
 37
 b. Section 1234a — Recovery of grants. The School further points to the express statutory authorization provided to the Department by 20 U.S.C. § 1234a to administer cost recovery actions for repayment of improperly disbursed grant funds.[12] This statute authorized the Department to require the repayment of grant funds, and set forth the procedures for the Department to review determinations that funds must be repaid. Id. The School argues that the Department's administrative assessment of liability in this case was essentially a cost recovery action, and that § 1234a shows an intent of Congress to limit administrative cost recovery proceedings to the recovery of grant funds — not the recovery of funds expended in the performance of guarantees of Title IV loans improperly obtained. Cf. Sullivan v. Am. Airlines, Inc., 424 F.3d 267, 277 (2d Cir.2005).
 
 
 38
 Once again we find the argument unconvincing. As with the provisions on limitation, suspension, termination, and civil penalty, § 1234a's express authorization to recover grant funds is not inconsistent with authorization to recover for loan program violations. Moreover, § 1234a is not even a part of Title IV or the HEA. It is part of the General Education Provisions Act, a separate statutory scheme that also governs the Department's administration of educational financial assistance programs. See 20 U.S.C. § 1221 et seq. Congress's enactment of § 1234a furnishes no convincing indication of Congress's intent with respect to FFEL programs, which are governed by a different statutory scheme. Furthermore, once again, Congress's broad grant of authority in § 1082(a) to the Department to promulgate regulations necessary to carry out the purposes of Title IV argues strongly against the School's contention that the remedy specified in § 1234a is exclusive.
 
 
 39
 c. Section 1082(a)(2) — "Legal powers and responsibilities . . . General powers." Finally, the School points to another provision of § 1082 which authorizes the Department to "sue and be sued" in court. See 20 U.S.C. § 1082(a)(2). The School argues that this provision shows Congress intended for the Department to bring suit in court to recover for violations of loan programs, and not to assess liabilities through administrative proceedings. We respectfully disagree. The School's interpretation is strained. There are many reasons why Congress would wish to grant the Department the power to sue, including enabling the conversion of an administrative determination to a judgment, which can logically explain the grant of power to sue without in any way supporting an inference that Congress intended to bar resort to such administrative determinations of liability.
 
 
 40
 In short, the School's arguments to the effect that Congress prohibited the Department from determining liability through administrative proceedings are weak and speculative at best. We therefore proceed to Chevron's second step to determine whether we should give deference to the Department's interpretation and whether its interpretation of its statutory authority is reasonable.[13]
 
 
 41
 2. Chevron Step Two — Reasonableness of the Department's Interpretation
 
 
 42
 The parties do not dispute that the Department is duly authorized to administer the HEA, including Title IV FFEL programs. The Department's interpretation in this case is therefore entitled to deference provided the interpretation is reasonable.[14] See Envtl. Defense v. U.S. E.P.A., 369 F.3d 193, 200 (2d Cir.2004). "An agency interpretation is reasonable if it is `rational and consistent with the statute.'" Protection & Advocacy for Persons with Disabilities v. Mental Health & Addiction Servs., 448 F.3d 119, 124 (2d Cir.2006) (quoting Sullivan v. Everhart, 494 U.S. 83, 89, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990)). Furthermore, the deference due in this case is at the high end of the spectrum of deference for two reasons. First, the interpretation in question is not merely ad hoc but is embodied in a duly promulgated regulation, which is applicable to all cases. See 34 C.F.R. § 682.609. Second, the governing statute clearly vested the Department with a broad authorization to promulgate regulations which it deemed necessary to carry out the purposes of Title IV. See 20 U.S.C. § 1082(a)(1). The Department's interpretation, therefore, is owed a considerable measure of deference if it is reasonable. See United States v. Mead, 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (noting that "[t]he fair measure of deference to an agency administering its own statute" varies according to "the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position").
 
 
 43
 We conclude that the Department's interpretation of Title IV — to the effect that it authorizes the Department to assess a liability for loan program violations through an administrative proceeding — is reasonable. It is not self-evident or indisputable that it is reasonable for an agency to act as the judge in a dispute in which it seeks to impose on another a liability to itself. Nonetheless, in these circumstances we are persuaded that this is in no way inconsistent with the intentions of Congress. The governing statutes explicitly grant such a role to the Department in at least two closely related circumstances. The Department is expressly authorized in administrative proceedings to assess civil penalties under § 1094(c) of up to $25,000 per instance for violations of program requirements, and to impose liability under § 1234a for the recovery of grant funds that were misused or were disbursed pursuant to a misleading application. Congress's express empowerment of the Department to assess liability in administrative proceedings in those circumstances strongly supports the view that Congress would find nothing unreasonable in the Department's institution by regulation of administrative proceedings to assess liability to recover its guarantee payments in cases of guarantees extended pursuant to improper documentation.
 
 
 44
 The administrative proceeding, furthermore, is an efficient, sensible mechanism for determining what is essentially a question whether vast repositories of documentation conform to specified requirements. If the dispute in this case went uncharacteristically further into statistical estimating, that was only because the School failed to preserve or produce its files as it was obligated to do. We see no reason why proceedings of this sort, which arise to determine liability of a program participant for certification of loans without paperwork demonstrating conformity to the legal requirements, cannot be appropriately conducted, at least in the first instance, in administrative proceedings. In the ordinary case, there would be little occasion for taking of testimony or for making determinations of reliability or honesty. Moreover, the apparatus for conducting such proceedings is already in place at the Department, as it is expressly authorized by statute to conduct administrative proceedings for the recovery of grants obtained through violation of legal requirements.
 
 
 45
 Finally, the Department's interpretation of the governing statutes to conclude that they authorize such administrative proceedings is quite consistent with the text and apparent intention of the statute. See Protection & Advocacy for Persons with Disabilities, 448 F.3d at 124. Although the statutes are silent on the Department's claimed authority, the Department's interpretation does not conflict with any statutory provision.
 
 
 46
 Finding that the Department is duly authorized to administer the HEA and that its interpretation of the HEA to be reasonable, we accord this interpretation deference under Chevron, and find that the Department has statutory authority to administratively assess a liability for loan program violations. The Department did not act in excess of its statutory authority.
 
 B. Arbitrary and Capricious
 
 47
 The School argues that the Department's calculation of liability in this case was arbitrary and capricious. See 5 U.S.C. § 706(2)(A). This standard of review is "extremely narrow." U.S. Postal Service v. Gregory, 534 U.S. 1, 7, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Ordinarily, agency decisions are not found to be arbitrary and capricious unless "the agency `has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Bellevue Hosp. Ctr. v. Leavitt, 443 F.3d 163, 174 (2d Cir.2006) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). We find no such flaws in the process here employed. We find nothing arbitrary, capricious, or unreasonable in the ALJ's determination that the School should bear a liability to the Department of approximately $1.3 million to reimburse the Department for disbursing guaranteed funds to cover loans that should not have been certified by the School.
 
 C. Compliance with Required Procedures
 
 48
 The School contends the administrative determination should be rejected on the grounds that the ALJ failed to comply with the governing statutes and regulations. In particular, the School argues that, at the time it requested a hearing, the governing laws required that such hearings be "on the record,"[15] and therefore required the Department to conduct an oral evidentiary hearing.[16]
 
 
 49
 We disagree. The statute relied on by the School did not require an oral evidentiary hearing. Section 1094(b) indeed required that the Department's hearing be "on the record." 20 U.S.C. § 1094(b) (1990). But the requirement that the hearing be "on the record" did not necessitate an oral hearing. The APA provided that an agency charged with conducting an "on the record" hearing could "adopt procedures for the submission of all or part of the evidence in written form," when, among other things, the claim is for money and "a party will not be prejudiced thereby." 5 U.S.C. §§ 554(a), (c), 556(d) (1990).
 
 
 50
 In accordance with this statutory authority, the Department adopted such procedures for the submission of evidence in written form. The Department's regulation provided:
 
 
 51
 (a) A hearing on the record is a process conducted by the administrative law judge whereby an orderly presentation of arguments and evidence is made by the parties.
 
 
 52
 (b) The hearing process consists of the submission of written briefs to the administrative law judge by the institution and by the designated [Department] official, unless the administrative law judge determines, under paragraph (g) of this section, that an oral hearing is also necessary.
 
 
 53
 . . . .
 
 
 54
 (g)(1) The administrative law judge may schedule an oral argument if he determines that an oral argument is necessary to clarify the issues and the positions of the parties as presented in the parties' written submissions.
 
 
 55
 (2) In the event that an oral argument is conducted, the designated [Department] official shall make a transcribed record of the proceedings and shall make that record available to the institution upon its request and upon its payment of a fee consistent with that prescribed under the Department of Education Freedom of Information Act regulations (34 CFR Part 5).
 
 
 56
 34 CFR § 668.116 (1992). This regulation permitted the ALJ to conduct the hearing with or without an oral component.[17]
 
 
 57
 The Department complied with the statutes and regulations in the administrative proceedings in this case. The claim at issue was for money, and, as discussed below, see infra Part II, the School was not prejudiced by the restriction to paper proceedings. The School was permitted to submit written briefs and documentary evidence. (It declined to submit documentary evidence despite repeated requests from the ALJ.) We conclude that the Department complied with applicable statutory and regulatory procedures in conducting the administrative proceeding.
 
 II. Collateral Estoppel
 
 58
 The district court granted summary judgment to the Department on its counterclaim, ruling that "de novo review would serve no purpose since the agency's fact finding was adequate and the issues were identical. The doctrine of collateral estoppel would apply to prevent relitigating the same issues once again." The School argues that the administrative determination should not be given collateral estoppel effect because the School was not afforded a full and fair opportunity to litigate the issues, as the administrative proceeding did not permit discovery or cross-examination.
 
 
 59
 "[T]o enforce repose," an administrative determination may be given collateral estoppel effect in a subsequent civil action "[w]hen an administrative agency [acted] in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). A requirement of collateral estoppel is that "there must have been `full and fair opportunity' for the litigation of the issues in the prior proceeding." Hirschfeld v. Spanakos, 104 F.3d 16, 19 (2d Cir.1997) (internal quotation marks omitted).
 
 
 60
 The School's strongest argument is that it was not permitted to cross-examine the Department's statistical expert. While denial of cross-examination of expert testimony might in some circumstances justify denial of collateral estoppel effect to an award based on such expert testimony, we find no need to do so in this case. The assumptions underlying the Department's statistical analysis and the calculations upon which it depended were revealed and explained in the Department's evidence. The School was free to offer competing statistical evidence (which it did not do) and to argue any claimed defects in the Department's analysis. In the district court, furthermore, in argument of the cross-motions disputing the applicability of collateral estoppel, the School had the opportunity to submit affidavits of attorneys or statistical experts explaining any respect in which the denial of cross-examination prevented the School from understanding or challenging the Department's statistical analysis. It submitted no such evidence. The School's argument comes down to nothing more than a claim that arguments rebutting the Department's analysis would have been more rhetorically effective in the form of cross-examination than in the form of written submissions of contrary evidence or argument. In these circumstances the unavailability of cross-examination was not significant.
 
 
 61
 We find no error in the district court's conclusion that the administrative proceeding offered the School a full and fair opportunity to litigate the issues. The administrative proceeding permitted the School to submit evidence and argument to the ALJ. The procedure was adjudicative, and the ALJ acted in a judicial capacity. There is no reasonable contention that the ALJ lacked independence and merely rubber-stamped the Department's positions, especially as the ALJ twice rejected the Department's statistical estimation of damages and made his award in a much smaller amount. The administrative order, moreover, was reviewed under the APA in district court. In these circumstances, we cannot say that the district court erred in barring relitigation of the findings made in the administrative proceeding. Cf. Kremer v. Chem. Constr. Corp., 456 U.S. 461, 483-84, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (informal prior administrative proceeding given preclusive effect); Hirschfeld, 104 F.3d at 19-20 (prior proceeding without cross-examination given preclusive effect); Wickham Contracting Co. v. Bd. of Educ., 715 F.2d 21, 27 (2d Cir.1983) (prior proceeding without prehearing discovery given preclusive effect).
 
 CONCLUSION
 
 62
 The judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 *
 Pursuant to Federal Rule of Appellate Procedure 43(c)(2), United States Secretary, of Education Margaret Spellings is automatically substituted for former United States Secretary of Education Richard W. Riley as a defendant in this action. The Clerk of the Court is requested to amend the official caption to match the above
 
 
 **
 The Honorable William K. Sessions III, Chief Judge of the United States District Court for the District of Vermont, sitting by designation
 
 
 [1]
 For purposes of this opinion, there is no material distinction between the Department of Education and the Secretary of Education. For ease of reference, "Department" is used below to denote both the agency and Secretary
 
 
 [2]
 In this opinion, as in the briefing of the parties and the opinions here reviewed, the Department's role with respect to defaulted program loans is described at times as insuring, reinsuring, guaranteeing, indemnifying, and reimbursing. No difference is intended from the use of the different terms. All are intended as describing the same relationship of reimbursing the guarantor of a defaulted loan for its guarantee payments
 
 
 [3]
 Citations are to current versions of statutes and regulations, except when the prior version is applicable and differs materially from the current version for purposes of this appeal. Citations to prior versions are accompanied by the effective date
 
 
 [4]
 "FFEL" programs were formerly known as "Guaranteed Student Loan programs" ("GSL programs")See Pub.L. No. 102-325, § 411(a), 106 Stat. 448, 510 (1992).
 
 
 [5]
 For example, to be eligible for a loan, some students were required to pass an "Ability to Benefit" test,see, e.g., 34 C.F.R. §§ 668.7, 668.14 (1988), 600.7, 600.11 (1989), yet the files of several approved students showed that the student had either failed the test, not taken it when it was required, or enrolled prior to taking it. The School was required to verify particular information given by students, such as income tax figures, number of household members, and non-taxable income, see, e.g., 34 C.F.R. §§ 668.56, 668.57, 668.59 (1987), but in several instances did not do so. The files of students did not include the required financial aid transcripts from their prior postsecondary education in several instances. See 34 C.F.R. § 668.19 (1988). Other instances of violations by the School included failure to include the earned income credit for a student when calculating the student's need, see 34 C.F.R. §§ 668.56, 668.57 (1987), certification of Stafford loans to students after their last day of their attendance, see 34 C.F.R. §§ 682.201, 682.603 (1987), failure to secure a statement from students about registration with the Selective Service, see 34 C.F.R. §§ 668.33, 668.34 (1985), failure to estimate properly other financial assistance a student had received, see 34 C.F.R. § 682.603 (1987), failure to provide exit counseling for student borrowers, see 34 C.F.R. § 682.604 (1989), unexplained adjustments to students' estimated family contributions, see 34 C.F.R. § 682.610 (1987), misrepresentations in student enrollment contracts about arrangements with third party credit companies, see 34 C.F.R. §§ 668.71, 668.72, 668.73 (1987), misrepresentations about eligibility for deferment of loan repayment, see 34 C.F.R. §§ 668.71, 668.72, 682.210 (1987), and other administrative failures.
 
 
 [6]
 Because the School failed to provide the requested data for all students who received Title IV aid, the Department "ha[d] no way to determine the extent of the institution's liabilities to lenders and to [the Department] for the regulatory violations cited." To calculate the School's "liability," the Department multiplied the total amount of Title IV aid disbursed to students at all of the School's seven campuses for 1987-1989 ($42,564,590) by the School's average "cohort default rate" for those years (54.4%). The cohort default rate is the percentage of students who default on their loans before the end of the fiscal year after the year the loan was receivedSee 20 U.S.C. § 1085(m)(1)(A). To this figure the Department added "Estimated Stafford Subsidies" and "Estimated Stafford Special Allowances" (the calculation of which is unexplained in the FPRD) to reach the $28,223,842 figure.
 
 
 [7]
 The ALJ found that the violations set forth in the FPRD were not "pervasive," and that the School submitted evidence refuting 27 of the 93 claimed violations. The School thus was not "institutionally ineligible," and not properly liable for all funds disbursed to its students that were not repaid. Rather, the School was only liable for funds loaned to students who were ineligible. The ALJ reasoned that the "more appropriate" method for estimating this liability was to determine the amount of funds loaned to ineligible students in the random sample, then to prorate this number so as to project the amount of funds loaned to all ineligible students at the three sampled campuses. According to the ALJ, $205,660 was loaned to students in the 187-student sample whose files included unrefuted violations, and the random sample was 10% of the total number of students at the three campuses. The ALJ found the School liable in the amount of $2,056,600 for "actual losses [determined] by extending the statistical sample to the universe of students," and, after adding a separate amount not pertinent to this appeal, found the School liable to the Department in the amount of $2,085,008
 
 
 [8]
 On remand, the Department suggested calculating the School's liability by adding together estimates of (1) the reinsurance payments the Department made on ineligible loans on which students defaulted, (2) the subsidies paid on ineligible loans, and (3) the special allowances paid on ineligible loans. With minor variations, the ALJ essentially adopted this methodology to hold the School liable for these three types of payments made by the Department
 
 
 [9]
 The School argues also that the Department lacked the authority under its regulations to assess liability through an administrative hearing. The School is incorrect. The Department's regulation, which was in force during the relevant time period, provided: "The Secretary requires a school to repay to the Secretary funds paid by the Secretary to other program participants if the Secretary determines that the payment resulted, in whole or in part, from — (1) The school's violation of a Federal statute or regulation. . . ." 34 C.F.R. § 682.609 (effective 1987-1992) (a modified version of this regulation is currently in force)
 
 
 [10]
 Although the document issued by the Department was a "Final Program Review Determination," neither party attaches significance to the word "final."
 
 
 [11]
 Section 1094(b) reads,
 (1) An institution that has received written notice of a final audit or program review determination and that desires to have such determination reviewed by the Secretary shall submit to the Secretary a written request for review not later than 45 days after receipt of notification of the final audit or program review determination.
 (2) The Secretary shall, upon receipt of written notice under paragraph (1), arrange for a hearing and notify the institution within 30 days of receipt of such notice the date, time, and place of such hearing. Such hearing shall take place not later than 120 days from the date upon which the Secretary notifies the institution.
 20 U.S.C. § 1094(b) (emphasis added).
 
 
 [12]
 Section 1234a states, in part, the following:
 (a) Preliminary departmental decision; grounds of determination; notice requirements; prima facie case; amount of funds recoverable
 (1) Whenever the Secretary determines that a recipient of a grant or cooperative agreement under an applicable program must return funds because the recipient has made an expenditure of funds that is not allowable under that grant or cooperative agreement, or has otherwise failed to discharge its obligation to account properly for funds under the grant or cooperative agreement, the Secretary shall give the recipient written notice of a preliminary departmental decision and notify the recipient of its right to have that decision reviewed by the Office and of its right to request mediation.
 (2) In a preliminary departmental decision, the Secretary shall have the burden of establishing a prima facie case for the recovery of funds, including an analysis reflecting the value of the program services actually obtained in a determination of harm to the Federal interest. The facts to serve as the basis of the preliminary departmental decision may come from an audit report, an investigative report, a monitoring report, or other evidence. The amount of funds to be recovered shall be determined on the basis of section 1234b of this title.
 
 
 [13]
 The Department contends the statutory scheme clearly authorizes the administrative proceedings it conducted. We find this argument no more persuasive than the School's. The provisions on which the Department relies merely show that it is authorized to promulgate rules,see 20 U.S.C. § 1082(a)(1), to conduct program reviews of participating schools, see id. § 1099c-1, and to conduct hearings when schools seek review of a program review determination, see id. § 1094(b). None of these provisions addresses the Department's authority to assess schools with a liability for loan program violations, nor for that matter its authority to undertake any particular enforcement or remedial action. (The Department does not rely on the liability clause in § 1082(a)(1), which was only added to the provision in 1992 and which does not relate to schools.) The legislative history on which the Department relies — the unexplained mention of "recovery of funds" in a conference report accompanying 1986 amendments to the HEA, see H.R.Rep. No. 99-861, at 424 (1986) (Conf.Rep.) — is inconclusive. Cf., e.g., H.R. Rep. 99-383, at 42 (1986) (as part of the same legislation, discussing recovering funds owed by guarantee agencies). We conclude that the HEA is silent on the precise question in this case, and thus proceed to Chevron's second step to consider whether the Department's interpretation is reasonable and is entitled to deference.
 
 
 [14]
 The School argues that the Department's interpretation in this case is not entitled to deference because the Department was interpreting contract, not statutory, provisions. We disagree. The Department interpreted statutory provisions, and this interpretation applied to the School once it was eligible and agreed to a program participation agreement. The Department interpreted the relevant provisions as an agency tasked with administering Title IV. Regardless of whether the provisions interpreted by the Department had a "contractual aspect," the Department is properly entitled toChevron deference. See Bennett v. Kentucky Dep't of Educ., 470 U.S. 656, 669, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985) (deferring to the Department's interpretations of statutory provisions that had a "contractual aspect").
 
 
 [15]
 The School emphasizes that the statutory and regulatory provisions requiring a hearing were amended at different times during the administrative proceeding in this case. Prior versions of the statute and regulation required that the Department conduct an "on the record" hearing, whereas later versions omitted the phrase "on the record."See 20 U.S.C. § 1094(b); 34 C.F.R. § 668.116(b). We need not address the School's arguments about which versions of the statute and regulation applied to the administrative hearing in this case. Even if the Department was required by statute to conduct an "on the record" hearing, we find that the Department complied with this requirement.
 
 
 [16]
 The School argues on appeal that it was deprived of procedures due under Department regulations and statutory provisions. It does not argue on appeal, as it did in the district court, that it was deprived of constitutional due process
 
 
 [17]
 The regulation seems to equate "oral hearing" with "oral argument." We need not address the variance in the terms of the regulation, because in any event the regulation does not require that an oral proceeding be held